Calvin BURKS et al., Plaintiff,

v.

James F. WALSH et al., Defendants.

Douglas THOMPSON, Plaintiff,

v.

Joseph P. TEASDALE et al., Defendants.

Daryl HINES, Plaintiff,

v.

Joseph P. TEASDALE et al., Defendants.

Nos. 75–CV–149–C, 77–4008–CV–C, 75–CV–100–C and 78–4093–CV–C.

United States District Court,
W. D. Missouri, C. D.

Nov. 3, 1978.

Michael J. Hoare, St. Louis, Mo., Steven G. Gladstone, A.C.L.U., Columbia, Mo., for plaintiffs.

William F. Arnet, Michael Boicourt, Asst. Attys. Gen., Jefferson City, Mo., for defendants.

## OPINION

ELMO B. HUNTER, District Judge.

The above-styled consolidated actions are brought pursuant to Rule 23, F.R.Civ.P., wherein the named plaintiffs seek injunctive and declaratory relief on behalf of all inmates presently confined at the Missouri State Penitentiary in Jefferson City, Mis-

souri [hereinafter sometimes referred to as the Penitentiary] and those to be confined there in the future.

With the consent of the parties, this Court, on August 10, 1978, severed the various issues raised by the Complaints and ordered that the September 25, 1978 trial be "limited to solely the issues of overcrowding and unsanitary conditions, the remaining issues raised by these actions to be tried at a date to be later set by the Court."[1] Specifically, plaintiffs ask that the Court find that, upon consideration of the totality of the conditions which exist at the Penitentiary, (1) the Penitentiary is so overcrowded and unsanitary that it is deplorable and inhumane and wholly fails to provide a tolerable living environment; (2) the conditions of confinement at the Penitentiary complained of herein serve no legitimate correctional purpose. Plaintiffs then ask that the Court declare, as a consequence of such findings, that the overcrowding and unsanitary conditions violate the Eighth and Fourteenth Amendments to the United States Constitution.

Defendants in these cases include Joseph P. Teasdale, Governor of the State of Missouri, James F. Walsh, Director of the Missouri Department of Social Services, Sheldon Bernstein, Deputy Director of the Department of Social Services, Donald R. Jenkins, Director of the Missouri Division of Corrections, and Donald W. Wyrick, Warden of the Missouri State Penitentiary at Jefferson City.

Jurisdiction is conferred by 28 U.S.C. § 1343(3) and (4).

## I

## THE PENITENTIARY: AN OVERVIEW

### A.

#### *Generally*

The Missouri State Penitentiary for Men at Jefferson City, Missouri covers 47.8 acres and is situated on a bluff overlooking the Missouri River. Buildings presently in use at the institution include Housing Units, a Maintenance Building, Clothing and Shoe Factories, Metal and Furniture Plants, a Soap Factory, Recreation Buildings, a Power Plant, a Hospital, an Administration Building, a Lower Yard Canteen, and a Garage Building.

Inmates at the Penitentiary reside in one of the seven housing units within the walls, the hospital, or in Housing Unit # 7, located outside the walls of the Penitentiary. Housing Unit # 1 contains the Diagnostic Center, which is the reception center for the entire Missouri prison system. Although it is located within the walls, defendants argue that it is not a part of the Missouri State Penitentiary. With this in mind, the parties have stipulated that the inmate population at the Penitentiary was as follows for the dates indicated:

| Date | Including HU # 1 and HU # 7 | Excluding HU # 1 Including HU # 7 | Excluding HU # 7 Excluding HU # 1 |
|------|------|------|------|
| 5–30–78 | 2,594 | 2,424 | 2,313 |
| 6–09–78 | 2,620 | 2,414 | 2,303 |
| 6–27–78 | 2,582 | 2,420 | 2,305 |
| 7–28–78 | 2,633 | 2,416 | 2,308 |
| 8–15–78 | 2,582 | 2,424 | 2,309 |

Although not the subject of a stipulation, Warden Wyrick did testify at trial that, as of September 28, 1978, the total inmate population at the Penitentiary, including both Housing Units 1 and 7, was 2,624; excluding Housing Unit # 1 only, the population was 2,442; excluding both Housing Units 1 and 7, the population was 2,330. According to defendants' Answers to Interrogatories, as of July 1, 1975, there were a total of 1,945 inmates housed at the Penitentiary, including both Housing Units 1 and 7; excluding Housing Unit # 1 only, the population was 1,729; excluding both Housing Units 1 and 7, the population was 1,621.

---

1. Also involved in these actions, though not now at issue, are plaintiffs' claims of inadequate medical care, unauthorized use of behavior-modifying drugs, unauthorized practice of medicine, and lack of appropriate due process procedures prior to confinement in the adjustment unit.

## B.

### The Long-Term Housing Units

### Housing Unit No. 2

Housing Unit No. 2 is what is known as a "cell block." A cell block is a structure containing four tiers of cells. The first tier of each cell block is referred to as "the flag," and each tier has two walks. Thus, Walks 1 and 2 are located on the flag (the first tier), Walks 3 and 4 are located on the second tier, etc. Housing Unit No. 2 is divided into two wings, the wings being separated by a rotunda, where the Sergeant's office is located. One wing is known as Housing Unit 2A (also known as F Hall) while the other wing is known as Housing Unit 2B (also known as G Hall). There are 24 cells located on each walk of Housing Unit 2A and 24 cells located on each walk of Housing Unit 2B, for a total of 192 cells located in Housing Unit 2A and 192 in Housing Unit 2B. One of the cells, however, on each walk in Housing Unit 2A has been converted into a shower area, as has one of the cells on each walk in Housing Unit 2B, according to the testimony of Warden Wyrick. Each of these shower cells is equipped with two shower heads, for a total of 16 shower heads in Housing Unit 2A and 16 shower heads in Housing Unit 2B.

Of the remaining 368 cells in Housing Unit No. 2, 366 are used to house inmates. Ninety of these cells contained one inmate, as of September 16, 1978, while 276 cells contained two inmates, for a total population of 642. This compares with a population of approximately 357 on July 1, 1975.

There are sixty-four window frames in Housing Unit No. 2, each measuring sixty feet in width by thirty feet in height.

The Housing Unit was constructed in the late 1930's and the cells contained therein measure 6'7" by 7'2" by 8'2", for a total of 47.18 square feet. The entire Housing Unit is devoted to the housing of inmates in the Penitentiary's general population.

### Housing Unit No. 3

Housing Unit No. 3 is also a cell block. Like Housing Unit No. 2, it is divided into two wings, the wings being separated by a rotunda, where the Sergeant's office is located. One wing is known as Housing Unit 3A (also known as C Hall) while the other wing is known as Housing Unit 3B (also known as D Hall). Housing Unit 3A has four tiers of cells and eight walks, as does Housing Unit 3B. Each walk has one shower area with two shower heads each, for a total of sixteen shower areas containing a total of thirty-two shower heads in Housing Unit 3. There are thirty-two window frames in Housing Unit 3, each measuring eight feet wide by twenty-four feet high.

Housing Unit No. 3 was constructed in approximately 1865 and contains 222 cells, each measuring 6'6" by 10' by 7'10" (65 square feet). As of September 16, 1978, each of the 222 cells in Housing Unit No. 3 contained two men, for a total population of 444.[2] This compares to a total population of 426 on July 1, 1975.

### Housing Unit No. 4

Housing Unit No. 4 was constructed in approximately 1865 and is what Warden Wyrick described as a "semi-honor dorm." Inmates must make written application to live in this unit, and that application is reviewed, together with the inmate's past conduct record, by the administration in order to determine whether the inmate in question has demonstrated an ability to live with his fellow inmates under a minimum of supervision. He described the beds contained in the unit as being wider and of superior quality, and further observed that they were not bunk beds, nor were they attached to the walls.

The unit contains 136 cells, each measuring 8'7" by 12'9" by 8'8" (109.437 square feet). It has one central shower area containing six shower heads.

Each cell in the unit has an individual window frame and, in addition, there are 32

2. The count of 222 cells and the inmate population figure of 444 do not include the statistics for the Administrative Segregation Unit, which is contained in Housing Unit No. 3.

window frames in the unit, each measuring approximately eight feet wide by twenty-four feet high.

As of September 16, 1978, each of the 136 cells contained in Housing Unit No. 4 housed two men, for a total population of 272. This compares to a total population of 240 on July 1, 1975.

### Housing Unit No. 5

Housing Unit No. 5 was constructed in the late 1930's and is a cell block, very similar to Housing Unit No. 2. It contains 364 cells which are used to house inmates, each measuring 6'7" by 7'2" by 8'2" (47.18 square feet). Like Housing Unit No. 2, it is divided into two wings, the wings being known as Housing Unit 5A (also known as J Hall) and Housing Unit 5B (also known as K Hall). The wings are separated by a rotunda, where the Sergeant's office is located.

Housing Unit No. 5A has four tiers of cells and eight walks, as does Housing Unit 5B. Each walk has one shower area with two shower heads each, for a total of sixteen shower areas containing a total of thirty-two shower heads in Housing Unit 5. There are sixty-four window frames in the Unit, each measuring eight feet wide by twenty-four feet high.

The first three tiers of Housing Unit No. 5A, containing 136 cells, constitute the Special Treatment Unit, to be discussed later. Including those inmates housed in the Special Treatment Unit, Housing Unit No. 5 contained 376 inmates on July 1, 1975 and 630 inmates on July 1, 1978. According to the stipulations of the parties, that figure had risen to 640 by September 16, 1978 and, according to Warden Wyrick's daily count sheet dated September 28, 1978, the figure had risen to 658.

If those inmates housed in the Special Treatment Unit are *not* included, then Housing Unit No. 5, as of September 16, 1978, contained 364 inmates, 88 in one-man cells, 138 in two-man cells.[3]

### Housing Unit No. 6

Housing Unit No. 6 was constructed in the late 1930's and is what Warden Wyrick describes as an honor dormitory. Inmates must make application to live in this unit, and that application is reviewed, together with the inmate's past conduct record, to determine whether the inmate in question has demonstrated an ability to live with his fellow inmates under a minimum of supervision. Mr. Wyrick emphasized that inmates are screened very closely before being placed in Housing Unit No. 6.

The unit consists of three floors, the first being devoted to indoor recreational activities such as pool, ping pong, checkers, and cards, and the second and third floors serving as living quarters. The unit has no cells; rather, it contains 86 cubicles, each made of ¾" plywood. The plyboard "walls" of each cubicle are only three and one-half to four feet high and are entered through an opening approximately two feet wide. The cubicles measure 7' by 7' (49 square feet) and each house one inmate, for a total of 86 inmates in Housing Unit No. 6. This compares to a total population of 83 on July 1, 1975.

There are two central shower areas in the unit, with four shower heads in each area, for a total of eight shower heads. The unit contains 32 window frames, each measuring 6' wide by 6' high.

### Housing Unit No. 7

Housing Unit No. 7 is a dormitory located outside the walls of the Penitentiary. It is a three-story self-contained unit with its own recreational and dining facilities. The inmates assigned to Housing Unit No. 7 work outside the walls of the Penitentiary and spend little time within the walls. According to the testimony of Warden Wyrick, about the only time an inmate housed in Unit No. 7 would come within the walls would be for sick call, religious services, or basketball and softball games against inmates of one of the other housing units.

3. The figures cited in this sentence are based upon the stipulations of the parties.

As it is located outside the walls, Housing Unit No. 7 is, of course, an honor dormitory. To get into Housing Unit No. 7, an inmate must appear before the Classification Committee after having been referred to them by his case worker. Among the things considered by the Committee is the type of crime for which the inmate was sentenced, the inmate's previous record at the Penitentiary and at any other institution to which he has been committed, and the sentence imposed.

Inmates housed in Housing Unit No. 7 are located on two floors of the unit, the remaining floor being devoted to food preparation and dining facilities. The two floors devoted to living quarters consist of long rows of double bunk beds with no barriers of any sort to separate them. Each of these two floors contains a central shower area, each containing four shower heads, for a total of eight shower heads in the unit.

The unit contains sixty-nine window frames, each measuring 4' wide by 6' high.

As of September 28, 1978, there were 112 inmates housed in Housing Unit No. 7. This compares to a total population 108 on July 1, 1975.

### Housing Unit No. 9

The building in which Housing Unit No. 9 is located was constructed in approximately 1955 and, until two years ago, was the Central Clothing Building where inmate clothing was issued. For the past two years, however, it has been operated as a dormitory, containing cubicles similar to, but a little larger than those cubicles contained in Housing Unit No. 6.

It is an honor dormitory and inmates must make application to be admitted there.

There is one central shower area in the unit, containing seven shower heads. There are nine window frames, each measuring 5' wide by 6' high, in the unit.

There are 55 cubicles in the unit, each of which measure 7'3" by 7'2" (51.958 square feet). As of September 16, 1978, the unit housed 55 inmates. According to the testimony of Warden Wyrick, this is the greatest number of inmates it has ever housed.

### C.

### *The Short-Term Housing Units*

### *Housing Unit No. 1 (the Diagnostic Center)*

Housing Unit No. 1 is the Diagnostic Center, the receiving unit for the entire prison system in Missouri. Inmates normally spend from one week to five weeks here before being transferred to various correctional facilities throughout the State, including the Missouri State Penitentiary at Jefferson City, Missouri.

Warden Wyrick is responsible for security at the Diagnostic Center and is also responsible for clothing, feeding, and providing medical care and recreational and religious services to the inmates temporarily housed at the Center. The Director of Classification and Assignment is responsible for the inmates at the Diagnostic Center in all other respects.

At the Diagnostic Center, inmates undergo physical examinations, take a battery of tests, and meet with caseworkers. In addition, they leave their cells three times daily for meals, once a week to go to the canteen, once a week to go to a movie, and once a week for gym (which lasts two hours). Inmates at the Diagnostic Center never go anywhere in the Penitentiary except under guard.

Housing Unit No. 1 was constructed in approximately 1865 and contains 92 cells, each measuring 7'3" by 8'2" (59.2 square feet). As of September 16, 1978, 59 cells in Housing Unit No. 1 contained two men each and 33 cells contained three men each, for a total of 217 inmates. On July 1, 1975, the unit housed 216 men.

The Unit contains a central shower area with thirteen shower heads.

### *The Special Treatment Unit (Protective Custody)*

The Special Treatment Unit (referred to as STU), which is contained in Housing

Unit 5A,[4] houses inmates who have expressed a fear of living in General Population. As explained by Warden Wyrick, any inmate who requests that he be placed in STU and who expresses a fear of living in General Population is automatically and immediately placed in the Unit.

The Special Treatment Unit is segregated from the General Population of Housing Unit No. 5 by chain link fencing and doors with security locks. Inmates in STU are permitted out of their cells three times a day to eat in the dining room (where they go under officer escort), one night a week to go to the gym (for 90 minutes), one night a week to go to a movie, and one night a week to walk around on the flag and visit (for 90 minutes).

Over fifty inmates in STU are involved in the educational program within the Unit.

The cells in STU measure the same as those in the General Population areas of Housing Unit No. 5 (6'7" by 7'2" by 8'2", or 47.18 square feet) and, as of September 16, 1978, it contained 138 cells with two men in each cell.

No out of doors exercise or recreation is provided for inmates in STU; rather, as earlier noted, they are permitted to go to the gym once a week for 90 minutes and are permitted on the flag of Housing Unit 5A once a week for 90 minutes.

Cells in STU have the same furnishings as those in the permanent housing units. The inmates confined to STU do the painting and other minor maintenance chores within the Unit.

### The Administrative Segregation Unit

The Administrative Segregation Unit, also known as "Ad Seg" and "the Basement," is located in the same structure as Housing Unit No. 3 and is used to house inmates who have committed acts of violence or attempted to escape.

Once placed in the Administrative Segregation Unit, the situation of each inmate is reviewed by the Classification Committee at the end of every 90-day interval to determine whether the inmate should be returned to General Population. According to the testimony of Warden Wyrick, an inmate is usually confined to the Unit for no more than one year, but some have been confined there for longer than four years.

As of September 16, 1978, the unit contained 55 cells, five cells with one bed and 50 cells with two bunks, each of which is 65 square feet in area. As of July 1, 1978, there were 152 inmates in the Unit, while in 1975, the population of the Unit varied from 108 to 145. When the number of inmates in an administrative segregation cell exceeds the number of beds, a mattress and a sheet are provided to accommodate the excess.

Cells in the Unit are furnished with beds, mattresses, toilet and basin. The inmates are allowed to have radios, games, food, cigarettes, books, newspapers and other personal items in their cells. They are not, however, provided a table, chair, or locker as are inmates in General Population.

Inmates in Administrative Segregation are permitted to exercise outside in a yard adjacent to the Unit twice a week for an hour each. They must remain in their cells except for shower periods, visitation, consultation with attorneys, work done in the Administrative Segregation Unit, appearance before Classification Teams, exercise periods, and hospital treatments. They are not permitted to eat in the dining hall; rather, they are served their meals in their cells.

There are five central shower areas in the Administrative Segregation Unit, four of which have three shower heads and one which has one shower head, for a total of thirteen shower heads.[5] Inmates in the Unit are allowed to shower once a day.

---

4. Specifically, the first three tiers of Housing Unit No. 5A, containing 136 cells, constitute the Special Treatment Unit.

5. The Stipulation of Facts submitted by the parties shows a slight discrepancy on this point. Paragraph 10 of the Stipulation states:

## The Adjustment Unit

The Adjustment Unit, also known as Punitive Segregation or "the Hole," is where inmates are confined, for less than ten days, for infractions of Penitentiary Rules. Usually, the infractions involve such things as cursing an officer or fighting.

Inmates confined in the Adjustment Unit are required to remain in their cells except during showers, visitation, consultation with attorneys, and hospital treatments. No exercise time is provided outside the cells. Like those confined to Administrative Segregation, those in the Adjustment Unit are not permitted to eat in the dining hall but are served their meals in their cells.

Inmates confined to the Adjustment Unit are not permitted to wear shoes (they can wear socks) and they must share the same razors, razor blades, and soap.

There are no sheets, pillows or lights inside the cells of the Adjustment Unit. No chair or table is provided in the cells either.

The Unit contains 18 cells, each of which is equipped to house two men, and has one shower stall with four or five shower heads.[6]

Warden Wyrick testified that the cells in the Adjustment Unit are of two sizes. The nine cells on the north side measure 7'7" by 8'10" (66 square feet) while the nine cells on the south side measure 8' by 8'6" (69 square feet). He further testified that while there have been as many as three persons confined to cells in the Adjustment Unit, there has never been, to his knowledge, four or more inmates so confined.

As is the Administrative Segregation Unit, the Adjustment Unit is located in the same structure as Housing Unit No. 3.

"In the Administrative Segregation Unit there are five central shower areas. Four of the shower areas have three shower heads in each area, and one of the shower areas has one shower head." Paragraph 72 of the Stipulation, however, states in part: "Four shower areas with a total of twelve heads are provided in this [the Administrative Segregation] unit."

## C.

### Other

### The Food Service Building

The dining facility at the Missouri State Penitentiary is located on the second floor of the Food Service Building and has a capability of seating 792 inmates at one time. The first floor of the Food Preparation Building is devoted to food storage, while the third floor serves as the kitchen and bakery. Food prepared on the third floor is transported to the second by elevator.

The parties have stipulated that "[a]ll inmates at the Missouri State Penitentiary, with the exception of those confined in the Punitive Segregation and Administrative Segregation Units, are served their meals from steam lines with inserts in cafeteria fashion in the dining hall," and that "[a]ll inmates . . . receive three meals per day."

The Penitentiary employs a civilian Food Service Supervisor, who has served in that position for the past four or five years and who has been employed by the Penitentiary for the past 16 years. In all, the Penitentiary employs 22 civilian cooks and bakers who, among other things, supervise the inmates assigned to work in the kitchen.

Warden Wyrick testified that the Penitentiary kept on hand a three month supply of meat (frozen), a seven to ten day supply of produce, and a five to six month supply of dry or canned goods. These foods are stored on the first floor of the Food Service Building.

The officers and all civilian employees at the Penitentiary, eat the same food as do the inmates. Warden Wyrick testified that the last food strike at the Penitentiary was in 1965.

6. Again, the Stipulations of Fact are contradictory. While paragraph 9 states that "[i]n the Punitive Segregation Unit there is one central shower area containing five shower heads," paragraph 71 states that "[t]here is one shower stall with four shower heads in the Adjustment Unit."

*The Visiting Room*

Warden Wyrick testified that inmates at the Penitentiary are permitted six visits per month on weekdays or four visits per month on weekends. Visiting periods last for six hours each.

While there were inmates complaints that the visiting room was too small, and that some of the visitors have been forced to sit on the floor, Warden Wyrick testified that he is in the visiting room at least five times per week and that he has never seen anyone sitting on the floor because of the lack of chairs.

Mr. William G. Nagel, one of plaintiffs' expert witnesses, testified that the visiting room at the Missouri State Penitentiary was a fine one, ranking with the better of the visiting rooms he has seen in the more than 400 prisons he has toured. He testified that it could accommodate up to 50 to 60 visits at a time, but said that even this capacity was not enough with an institution as large as the Missouri Penitentiary.

*Recreational Facilities*

Among the recreational facilities available to the inmates at the Missouri State Penitentiary are an oversized gymnasium with six basketball goals (capable of simultaneously accommodating two full court games or six half court games), three baseball diamonds, seven handball courts, a weight lifting machine capable of being used simultaneously by sixteen men, shuffleboard decks, ping pong tables, card tables, an outdoor roller skating rink, two paddle tennis courts, two volleyball courts, and four outdoor basketball goals. A more extensive discussion of these facilities will occur later in this Opinion.

## II

## THE WITNESSES

### A.

### The Experts

*Dr. Ernest L. V. Shelley*

Dr. Shelley, called as plaintiffs' first expert witness, presently serves as Professor of Psychology at Olivette College in Michigan and as Chief Psychologist for the County Juvenile Court in Lansing, Michigan. He has a Master's Degree in Psychology from Columbia University (which he earned in 1938) and obtained his Ph.D. at Michigan State University in 1959.

Dr. Shelley has been in close contact with the field of corrections over the years. In the 1950's and 1960's, he was employed by the Michigan Department of Corrections as, among other things, the Director of Treatment. In 1967, he was a member of a three-person task force employed by Governor Rockefeller to study the New York Prison System. In 1972, he participated in the Geneva, Switzerland Conference on Penal Reform.

Dr. Shelley toured the Missouri State Penitentiary for the major portion of a day in January, 1975, at which time he saw most of the institution. His purpose in touring the Penitentiary at that time was to evaluate certain volunteer programs and not for the purpose of determining if it was overcrowded. He testified that he has no personal knowledge of the present inmate population or of the conditions now existing at the Penitentiary.

### Mr. William G. Nagel

Mr. Nagel, called as plaintiffs' second expert witness, presently serves as the Executive Vice-President of the American Foundation, Inc. and as Director of that organization's Institute of Corrections in Philadelphia, Pennsylvania. He has been involved in the area of corrections for 32 years and, in that time, has seen approximately 400 prisons in some 40 states.

Before assuming his present position with the Foundation in 1967, Mr. Nagel served 11 years as Deputy Warden of the New Jersey Correctional Institute.

He describes himself as a reformer in the field of corrections and is of the opinion that the prisons in this country are generally failures. He is further of the opinion that because of the rapid changes in penal theory, prisons become outdated within fif-

teen years of their construction. He testified that he would criticize a majority, though not all, of the penal facilities that are now being or have recently been constructed in this county.

Mr. Nagel further testified that he does not believe that the State of Missouri needs more prisons to solve what he views as the overcrowding problem at the Missouri State Penitentiary; rather, he believes that Missouri already has enough cells to house the truly dangerous inmates. The others, in his opinion, should either be paroled, granted clemencies, placed on work release programs, or put in minimum security facilities.

Mr. Nagel first toured the Missouri State Penitentiary in January, 1976, at which time he went through all the housing units, the gymnasium, visiting room, industrial buildings, segregation units, dining room, yard, and, according to his testimony, pretty much the whole institution. He again toured the Penitentiary the morning before he testified in this case in September, 1978, at which time he went through six housing units, all the industrial buildings, the visiting room, the yard, the recreational areas, and the laundry.

### Mr. James D. Henderson

Mr. Henderson, Regional Director of the North Central Region of the United States Bureau of Prisons, was called as one of defendants' expert witnesses. Among his many duties in his twenty-six years with the U. S. Bureau of Prisons, Mr. Henderson has served as a Correctional Officer at the United States Penitentiary at Leavenworth, Kansas, as a Correctional Supervisor at the Federal Reformatory at Petersburg, Virginia, as head of all custody and security for the Bureau of Prisons (at which time he officed in Washington, D. C.), as Associate Warden of the Federal Youth Center in Ashland, Kentucky, as Associate Warden in Charge of Custody at the United States Penitentiary at Terra Haute, Indiana, as Warden of the Federal Correctional Institute at Milan, Michigan, and as Warden of the United States Penitentiary at Atlanta, Georgia.

Mr. Henderson has visited all of the thirty-nine federal correctional facilities in the United States and has toured approximately a dozen state penitentiaries. He first toured the Missouri State Penitentiary on August 11, 1976, from approximately 8:30 a. m. to 5:00 or 6:00 p. m., at which time he viewed the entire institution. His next tour was Wednesday, October 4, 1978 (the day before he testified in the trial of this cause) from approximately 10:00 a. m. to 4:00 p. m.

### Dr. Ellis C. MacDougall

Dr. MacDougall, presently Director of the Arizona Department of Corrections, was another of defendants' experts. He holds a bachelor's degree in psychology, a master's degree in criminology, and an honorary doctors of law degree.

From January, 1974 until he obtained his present position in June, 1978, Dr. MacDougall served as Associate Dean and Professor in the College of Criminal Justice at the University of South Carolina. From 1971 to 1974, he was Commissioner of Corrections and Offender Rehabilitation for the State of Georgia. From 1968 to 1971, he was Commissioner of Corrections for the State of Connecticut, and prior to that he served as South Carolina's Commissioner of Corrections.

He has toured the Missouri State Penitentiary three times: in December, 1973, in December, 1976, and on September 28, 1978, the evening before he was called by defendants to testify at trial.

### B.

### The Administrators

### Mr. Donald W. Wyrick

Warden Wyrick has been connected with the Missouri Division of Corrections since 1959. In April, 1959, he assumed the position of Senior Guard at the Penitentiary. He was then promoted to Guard Sergeant at the Penitentiary and, in 1964, assumed the duties of a Guard Lieutenant at the Honor Camp in Fordland, Missouri. In

1967, he returned to the Penitentiary as the Warden's Administrative Assistant. In 1969, he was promoted to Associate Warden of Custody, in which position he was in charge of security, maintenance, and food service. In February, 1974, he was promoted to his present position of Warden of the Missouri State Penitentiary.

As Warden, Mr. Wyrick is the chief administrative officer of the Penitentiary and exercises executive control of the activities relating to the conduct of the prison. He is directly responsible to the Director of the Division of Corrections.

Warden Wyrick spends seven days a week at the Penitentiary. On weekdays, he arrives at 6:30 a. m. and leaves work from between 9:00 p. m. to 1:00 a. m. Six or seven hours per day is devoted to his office work, while the remainder of the time is spent going through the various facilities at the prison. On weekends, he arrives at work at 8:00 or 9:00 a. m. and leaves at approximately 1:00 p. m.

He is a member of the American Correctional Association and the Missouri Correctional Association.

### Mr. Bill Armontrout

Mr. Armontrout has been associated with the Missouri Division of Corrections since October 1, 1969, serving first as Plant Maintenance Engineer # 1, then as Plant Maintenance Engineer # 2, and then as Associate Warden of Custody. He presently serves as Associate Warden of Institutional Services, in which capacity he is the direct supervisor in charge of security, maintenance, food service, and medical services.

He holds a Bachelor's degree from Lincoln University in Law Enforcement and a Master's degree in Criminal Justice from Central Missouri State University. He is a member of the American Correctional Association, the Missouri Correctional Association, and the Deputy Wardens Association.

### C.

### The Inmates

### Mr. Willie Norwood

Mr. Norwood has been at the Penitentiary for approximately six and one-half years, where he is serving two life sentences for first degree murder and forcible rape. He has a prior conviction of assault with intent to kill.

He lives in Housing Unit 5B and has worked as a dental assistant at the Penitentiary for the past one and one-half years.

He usually rises at 7:30 a. m., works, has dinner at 3:30 p. m., and returns to his cell by 4:00 p. m. for the evening count.[7] In the warmer months, he goes out into the yard after the count is completed and stays there from approximately 5:30 to 8:00 p. m. In the winter months, when there is no evening yard, he usually stays in his call from 4:00 p. m. until the next morning except for going to the gym once a week or to watch television. He does, however, take advantage of the winter yard activities on Saturday and Sunday.

He is a member of Lifers, Inc., an inmate organization.

### Mr. Edward Lee Clemmons

Mr. Clemmons has been an inmate at the Penitentiary since February, 1970, where he is serving a twenty year and a five year sentence for two instances of first degree robbery. He escaped from the Penitentiary on November 19, 1977, but was returned on June 9, 1978. Since his June, 1978 return, he has been housed in protective custody (the Special Treatment Unit) and has had no cellmate.

### Mr. Donald Helms

Mr. Helms, age 27, is serving a forty year sentence for second degree murder. He

---

**7.** The parties have stipulated that "counts" are taken at 5:00 p. m., 10:00 p. m., 12:00 a. m., 2:00 a. m., and 4:00 a. m. Inmates who have jobs are also counted upon their arrival at their respective jobs at approximately 8:00 a. m. by their work supervisors and at approximately 12:15 p. m. by their work supervisors. The 5:00 p. m. count begins at 4:30 p. m. and takes approximately one hour to complete.

lives in Housing Unit No. 4 and has had five different cellmates since his arrival at the Penitentiary.

He usually rises at 6:00 a. m., attends Vocational Training School from 8:00 a. m. until 3:30 p. m., and remains in his cell until the next morning unless he attends a college class or goes to the showers.

His activities include his classes at the Vocational Training School and the Academic College, the College Student Council Committee, and Lifers, Inc.

### Mr. William Scott Sours

At the age of 25, Mr. Sours is serving his second term at the Penitentiary. In 1974 and 1975, he was serving a sentence for burglary. He returned to the Penitentiary in January, 1978 where is is presently serving a sentence for Robbery in the First Degree.

He lives in Housing Unit No. 5A and works at the Bakery from 5:00 a. m. to 7:00 or 7:30 a. m., Monday through Saturday. He arrives back at his cell for the night either at 2:30 p. m. or 6:30 to 7:00 p. m., depending on whether he is involved in any evening activity.

He plays handball approximately one day per week, but complains that he has to wait in line for 45 minutes to play a 10 minute game.

### Mr. William C. Neighbors

Mr. Neighbors, age 31, arrived at the Penitentiary on July 29, 1977 and lives in Housing Unit No. 3A. For the past four or five months, he has worked as the exterminator at the Penitentiary and is paid $17.50 per month therefor.

He rises at 6:00 or 6:30 a. m. and enters his cell for the evening at approximately 7:00 p. m.

He has seven felony convictions.

### Mr. Harold Hawkins

Mr. Hawkins, age 21, has been at the Penitentiary since January, 1978 and is serving a twenty-eight year sentence for robbery. He works and lives in the Penitentiary Hospital, where he is on call twenty-four hours a day.

### Mr. Cliff Gardner

Mr. Gardner, age 31, has been at the Penitentiary since September, 1976 on his present sentence of thirty years for selling a controlled substance. Approximately ten years ago, he was serving time at the Penitentiary on a burglary conviction.

He now lives in Housing Unit No. 5A, attends college, and has been involved in the educational programs at the Penitentiary since he arrived.

He is employed at the Metal Plant and works four days per week at a rate of $2.20 per day. He complains, however, that, at times, there is not enough work to keep the inmates occupied at the Metal Plant.

Mr. Gardner rises at just before 6:00 a. m. and returns to his cell for count at 4:00 p. m. When count clears (usually at 5:45 p. m.), he showers and, on Thursday evenings, attends his college class.

### Mr. David Berry

Mr. Berry is housed in Housing Unit No. 4 where he is serving a life sentence for first degree murder and second degree burglary. He usually gets up at 7:30 a. m., works at his job in the Cleaning Factory, and returns to his cell at 4:00 p. m. for count.

He is active in Alcoholics Anonymous, Lifers, Inc., Great Books, and the NAACP. He spends much of his free time reading.

He goes to the gymnasium just about every day at 11:20 a. m. and is on out-count three evenings per week to attend various organizational meetings.

### Mr. John Wayne Sandifer

Mr. Sandifer presently lives in Housing Unit No. 4 and has been at the Penitentiary for the past five and one-half years. His offenses include, among other things, rape and robbery.

He usually gets up at 6:30 a. m. and is not back in his cell until 3:45 or 4:00 p. m. In

the evenings he is on out-counts "all the time" and usually arrives back at his cell for the night at 8:00 or 9:00 p. m. He testified that he is in his cell from 4:00 p. m. to 7:00 a. m. "very few times."

He participates in the Transactional Analysis group at the Penitentiary, brailles, and lifts weights in the basement of the housing unit in his spare time.

### Mr. Louis Mack

Mr. Mack, age 31, lives in Housing Unit No. 4 and is serving sentences for robbery and first degree murder. He has been at the Penitentiary for seven years and is engaged in a great many activities. He is President of Lifers, Inc. (and has been for the past three years), President of the NAACP at the Penitentiary (and has been for the past ten months), and is the Clerk of Alcoholics Anonymous (and has been for the past two and one-half years). He also holds the position of Secretary of the President's Council, an organization which has as its members the Presidents of all organizations at the Penitentiary.

Mr. Mack usually gets up at 9:00 a. m. and does not return to his cell for the night until approximately 9:30 p. m. He testified that he usually skips breakfast because all that is served is oatmeal and cream of wheat (except on Sundays, when bacon and eggs are served).

### Mr. Arthelle McClain

Mr. McClain lives in Housing Unit No. 2B and has been at the Penitentiary for the last five years serving a life sentence for first degree murder. He is employed as an audio-visual clerk at the Penitentiary's library, where he is in charge of all the films, records, and tapes. His recreational activities include boxing and jogging. He complains that an inmate could spend his entire day in the boxing room several years ago, but that now the room is simply too crowded. He also testified that the Library at the Penitentiary was not sufficient to permit inmates to do an adequate job on term papers assigned in their college classes.

### Mr. Rex Peck

Mr. Peck, age 44, has lived in Housing Unit No. 3B for the past twenty months. He has spent sixteen of the past twenty-six years in prison. He is employed as an oven cleaner in the main kitchen, where he works, with an assistant, from 10:30 to 12:30 every day.

He testified that he gets up between 9:00 and 9:30 a. m., never eats breakfast, eats lunch in the kitchen, and eats dinner only once or twice per week in the kitchen. He never eats his meals in the dining hall.

### Mr. Ervin F. Owens

Mr. Owens, age 31, has been at the Penitentiary since July, 1972 and is serving a sentence for first degree murder, robbery, and kidnapping. He lives in Housing Unit No. 4. For the past two years, he has been employed in the tailor shop, where inmate shirts, pajamas, and other items of wearing apparel are made.

He usually rises at 7:00 a. m., gets to work by 7:30 a. m., and enters his cell for count at 4:00 p. m. He remains in his cell on Monday and Tuesday evenings rather than going to the yard, and is on out-counts for various activities on all other evenings of the week. He showers every evening.

## III

## THE CONDITIONS OF CONFINEMENT AT THE MISSOURI STATE PENITENTIARY

### A.

### Conditions Within the Cells

Aside from the complaints registered by the inmates as to the actual physical dimensions of the cells, there was a great deal of testimony pertaining to other aspects of the conditions within each cell. These complaints centered on the toilets within each cell, the odors emanating therefrom, the temperature inside the Housing Units in the winter, and the availability of hot water and cleaning materials.

Inmate Norwood (HU 5B) and inmate Gardner (HU 5A) pointed out in their testimony that there were no covers or seats on the toilets, that these uncovered toilets were located at the back of each cell, two feet from the bottom bunk, with no partition between the toilet and the bunks. Both observed that because of the danger of sleeping with your head at the bars, they had no choice but to sleep with their heads close to the uncovered toilet.

While Mr. Norwood's present toilet functions well, he testified that the toilet he had in a prior cell flooded the cell frequently and that if one toilet floods, all other toilets on the walk also flood.

Inmate Peck (HU 3B) testified that when one toilet was flushed, the toilets four or five cells down on either side would back up and would have to be flushed too.

Inmate Owens (HU 4) testified that when someone above him flushes the toilet, his (Owens') toilet backs up, but does not overflow. This back-up, however, causes Mr. Owens to have to flush his toilet frequently to rid his cell of odors.

Inmate Helms (HU 2A) stated that while he has had no problem with his toilet, he has had sewage on the floor of his cell because the toilets of others had backed up. Inmate Gardner (HU 5A) testified that the toilet in his cell has overflown on several occasions during his confinement at the Penitentiary.

Inmate Norwood (HU 5B) testified that his cell usually "smells pretty bad," and that the only way to combat the odor is to clean it himself. He complains, however, that the mop on his walk is usually in use. He further stated that he has asked the appropriate officer for disinfectant to clean his cell, but his requests were met with refusals "many times." On cross-examination, however, he testified that he could not recall the last time when he asked an officer for disinfectant and was refused.

Inmate Gardner (HU 5A), when asked to describe his cell's odor, replied that there was "no way to describe it." He did state, however, that he swept his cell every day

and that he would occasionally clean it with soap and water.

Dr. Shelley, plaintiffs' expert, testified however that when he toured the Penitentiary in January, 1975, he was very impressed with its cleanliness. Mr. Nagel, plaintiffs' other expert witness, testified that he had just returned from a tour of the Penitentiary prior to testifying and that the Penitentiary appeared to be reasonably clean. In fact, on cross-examination, Mr. Nagel stated that the Missouri State Penitentiary was one of the cleanest correctional facilities he had ever seen (and he has been in approximately 400 correctional institutions). On his tour of the Penitentiary the day he testified, Mr. Nagel observed no roaches, mice, or other vermin, either in the cells or the industries. He further testified that the Administrative Segregation Unit and the Special Treatment Unit were clean.

Dr. MacDougall, one of defendants' expert witnesses, toured the Penitentiary the evening before he testified, and said that he was "tremendously impressed" with the cleanliness of the entire institution. Mr. Henderson, defendants' other expert witness, testified that "the sanitation and housekeeping in the general institution was good to outstanding." He rated the common areas at the Penitentiary as "very good" with regard to cleanliness and noted that many cells were clean, although some were not. He testified that he did not notice any unusual odors on his day-long tour of the prison.

The availability of hot water to clean the cells seems to vary from Housing Unit to Housing Unit. While the cells themselves have no hot water, the utility sinks at the end of each walk and the showers are supplied with hot water.

Inmate Neighbors (HU 3A) testified that he gets hot water from the utility sink on his walk and inmate McClain (HU 2B) testified that a walk man (an inmate whose job it is to wet mop the walks) will get you hot water when you ask for it. While inmate Sours (HU 3A) testified that the utility sink on his walk was out in the open, inmate Norwood (HU 5B) testified that the utility

sink on his walk is contained in a closet which is kept locked by a combination lock. Inmate Gardner (HU 5A) stated that it was his understanding that the utility room sink is to be used only by the walk man and that other inmates are not permitted to use it.[8]

According to the inmate testimony, the poor living conditions within the cells are aggravated by the many broken windows in the Housing Units. Inmate Norwood testified that there were twenty-two windows broken in Housing Unit No. 5 in August of 1978. Inmate Neighbors (HU 3A) testified that while there were no broken windows immediately outside his cell area, there were some broken windows in the Housing Unit. Inmate Owens (HU 4) testified that a small window pane in his cell had been missing since February, 1975, and is covered with plywood. He states that he has requested that it be repaired, but that nothing has happened thus far. Inmate Gardner (HU 5A) testified that there were, at the time of trial, broken windows directly across from his cell.

According to the inmate testimony, not only do the broken windows and the absence of screens allow insects to come into the housing units during the Summer, it makes for uncomfortably cool temperatures in the Winter.

Inmate Norwood (HU 5B) testified that during the winter months, the temperature in the lower tier cells is "very cold" while the temperature in the upper-tier cells is hot. In January, Mr. Norwood goes to bed with thermals on and, at times, also wears a sweatsuit to bed.

Inmate Berry (HU 4) also testified that the temperature in the lower tiers is very cold in the winter, while it is comfortable towards the top, and that he has to wear thermal underwear in the winter. Inmate Mack (HU 4) described his cell as "rather cold" in the winter while inmate Owens (HU 4) describes his cell as "considerably cold" in the winter. Mr. Owens testified that he found it necessary to sleep in thermal underwear, pajamas, and two blankets in the winter. Inmate Gardner (HU 5A) testified that his cell got so cold last winter that ice formed in the toilet bowl. He further stated that it got so cold in his cell one night last winter that he slept in his coat.

Warden Wyrick testified that all broken windows at the Penitentiary are replaced on an annual basis, in either the late Summer or early Fall. He further testified that he was in the various housing units in each month of last winter, often without a coat, and described the temperature within the units as "comfortable."

## B.

### The Showers

The showers at the Penitentiary were the subject of much inmate criticism at trial.

Inmate Norwood (HU 5B) described the shower floors as gooey and slippery; Helms (HU 2A) said they were slippery; Sours (HU 3A) said that the floor gets slimy and that moss grows around the water drains; Neighbors (HU 3A) observed that many shower areas are dirty while Gardner (HU 5A) testified that they are "usually nasty." Berry (HU 4) said that the floors of the shower area are slick, moldy, and grimy, Sandifer (HU 4) said the floors were slippery when soapy, and McClain (HU 2) testified that the shower areas are dirty and that the paint jobs in the shower areas are bad. Neighbors, on the other hand, did point out that one shower area on his walk had recently been painted.

Inmate McClain stated that he wore shower shoes when he showered to keep his feet off the floor. Gardner stated that the shower drains on his walk are frequently clogged, causing the water in the shower area to stand three to four inches deep.

---

8. While on the subject of the availability of hot water, it should be noted that several inmates complained that they had to shave with cold water. In mitigation of this inconvenience is the availability of electrical outlets in the cells for electric razors and the fact that, as one inmate testified, for as little as sixty-five cents to a dollar, a device can be purchased at the canteen which can be used by the inmates in their cells to heat cups of water.

The walls of the shower area, according to inmate Norwood, are moldy; Mr. Gardner states that fungus grows on the walls of his shower area.

The testimony of all the inmates indicates that no mats or planking are in the shower areas and that the inmates must stand on slippery, wet concrete while showering.[9]

While inmate Norwood did indicate some dissatisfaction with the fact that he has had to miss showers because there were too many other inmates waiting ahead of him, he later conceded that this has only occurred four or five times in the past six and one-half years. Inmate Gardner stated, however, that if an inmate goes to yard in the summer, he may not be able to shower.

Other complaints pertaining to the showers include Norwood's comment that the shower curtain was dirty and torn in several places, Helms' statement that his shower area had a foul odor, and Neighbors' observation that it was often difficult to regulate the water temperature.

Mr. Nagel, one of the expert witnesses called by plaintiffs, testified that on his September, 1978 visit to the Missouri State Penitentiary, he noticed that the shower areas were not always clean, some having rust and mold in them. In his opinion, two or three shower areas in the Penitentiary were less than adequate, but he did point out that this was not unusual. He said that he saw no showers which he would describe as filthy.

Mr. MacDougall, one of defendants' experts, testified that showers are a problem in every prison in the country, but added that he wished that showers in other correctional institutes were as clean as those at the Missouri State Penitentiary. Mr. Henderson, defendants' other expert, described the shower areas at the Penitentiary as clean and sanitary.

C.

*Noise Level*

Another of the inmates' grievances is the noise level in the housing units. The noise is particularly high between 8:00 p. m., when inmates are returning from the yard, and 10:00 p. m. when all televisions, stereos, and tape players have to be turned off, turned down, or used with an earplug.[10]

Inmate Norwood (HU 5) described the noise level between 8:00 p. m. and 10:00 p. m. as very noisy—like a factory. He testified that he combats this noise by turning up his radio. Inmate Helms (HU 2A) described the noise during this time period as similar to that at a football game. Inmate Gardner (HU 5A) states that the noise level is so high that it is impossible to concentrate, and says that the sounds all begin to blur, like five or six records playing at once.

Inmate Sandifer (HU 4) testified that it was fairly noisy during this time period in his housing unit, but that because prisoners housed in Housing Unit No. 4 are allowed to hang curtains in the front of their cells, the noise is somewhat muffled.

Inmate Mack (HU 4) testified that there is a "droning sound" like a car that needs a muffler in his housing unit between 8:00 p. m. and 10:00 p. m. Inmate McClain described the noise level in Housing Unit No. 2 as nerve-wracking and beyond one's capacity to endure. Inmate Peck testified that the televisions and radios going full blast, the vibration, and the screaming gets so bad in Housing Unit 3B between 8:00 p. m. and 10:00 p. m. that he simply goes to bed and puts his head under a pillow.

Both inmates Gardner and McClain testified that the noise level between 8:00 p. m.

**9.** Inmate Sandifer, who lives in Housing Unit No. 4, testified that, until recently, there was planking in the shower areas of that Housing Unit.

**10.** Until recently, inmates had to turn off their televisions, stereos, and tape players at 10:00 p. m. or, in the alternative, use an earplug. However, as explained by Warden Wyrick, since more and more inmates have color televisions, and since color televisions are rarely equipped with earplugs, it is now required that televisions can be watched after 10:00 p. m. without earplugs provided they are turned down low. Warden Wyrick felt this was a necessary change in prison rules so as not to discriminate against those inmates with color televisions.

and 10:00 p. m. interfered with their academic studies: Gardner has to wear his headphones—unplugged—to reduce the noise when studying, while McClain simply waits until after the noise dies down at 10:00 p. m. to do his studying.

Inmate Norwood testified that there was nothing in the Housing Units which operate to lessen the noise level.

Dr. Shelley, one of plaintiffs' experts, testified that noise and violence in a prison are related, observing that the clanging of metal on metal and metal on concrete can cause exasperating tension. This tension, in turn, causes the inmate's nervous system to become overcharged which, in turn, causes more noise to be generated, causing even more tension, and on and on, in what Dr. Shelley describes as a vicious circle. The ultimate result of this vicious circle is, according to Dr. Shelley, an urge on the part of the inmate to *do something*. Dr. Shelley thus sees a direct relationship between noise and violence in a prison.

Mr. Nagel, plaintiffs other expert witness, pointed out that because prisons are "architecturally hard," they are, to a certain degree, inherently noisy. He described the noise in the Administrative Segregation Unit at meal time, however, as unbelievable. The combined noise of serving trays clanging, the opening and closing of doors, and of human voices created such a din that he claimed "an hour of that would drive me crazy," emphasizing that he was not particularly sensitive to sound.

Dr. MacDougall, one of defendants' experts, testified that the cell blocks were not, in his opinion, too noisy. In fact, they were quiet enough that, between 8:30 p. m. and 9:30 p. m., he could hear the showers running even from outside the cell block. Mr. Henderson, defendants' other expert witness, described the cell blocks as very quiet, but it should be pointed out that he toured the housing units at a time when most inmates were away from their cells because of jobs, vocational training school, or other activities.

### D.

### *The Kitchen and Dining Hall*

The cleanliness of the kitchen and dining hall, or the lack thereof, was the subject of much testimony. Inmate Sours, who works at the bakery, testified that there are mice, flies, cockroaches, and mice droppings in the food preparation area. He further testified that there is a greasy slime on the utensils, and that he has seen moldy cornbread and liver with mold on it in the kitchen. Sours also related an incident in September, 1978, where bread dough was dropped on the floor and the civilian in charge of the kitchen ordered that the dough be used nevertheless.

Inmate Peck, who works as an oven cleaner, testified that the kitchen, the kitchen floor, the kitchen utensils, and the people who work in the kitchen, are filthy. He also pointed out that it was commonplace to see roaches in the kitchen.

Inmate Neighbors, the Penitentiary's exterminator, testified that he sprayed the kitchen three times per week and the dining hall six times per week, and that the pots and pans are sitting out in the open when he sprays. Warden Wyrick, on the other hand, testified that all pots and pans in the kitchen are to be covered with plastic before the room is fogged and that he personally saw inmate Neighbors doing so just a couple of weeks before trial.

Other inmates were not so critical of these areas. Inmate Berry testified that the tables in the dining hall are clean and that the trays are usually clean. He did relate an incident which occurred two weeks prior to trial where he found some leftover food on a tray, but he stated that he merely put the tray back and chose another. He further testified that he has seen only fifty to sixty dirty trays since he arrived at the Penitentiary in 1973.

Inmate Sandifer stated that he has seen cockroaches in the dining hall, but that he has not seen them often. Inmate Gardner testified that he was not sure when he last saw bugs in the dining hall.

Warden Wyrick did point out in his testimony that the prison administration and all civilian employees at the Penitentiary (including those civilian employees who work in the food preparation areas) eat the same food as do the inmates.

While there was some testimony to the effect that the dining hall was ill-equipped to seat the number of inmates required, the bulk of the evidence indicated that the inmates had adapted themselves well to the situation. While there are only four seats per table, and while as many as six to ten inmates, out of custom and habit, sit at one table, they stagger their meal times so that as some arrive at the table, others are finishing their meals.

Inmate Berry testified that he has seen other inmates arguing over seating, but he has never seen any actual fighting break out over seating in the dining hall. Inmate Peck, however, testified that while he has never seen a fight in the dining hall itself over seating, he has seen fights break out elsewhere in the Penitentiary which result from what he views to be an overcrowded dining hall.

Inmate Mack stated that he believed the dining hall to be too congested and, on at least one occasion, has seen a person standing up to eat in the dining hall.

Mr. Nagel, one of plaintiffs' experts, testified that he visited the food preparation area on his 1976 tour of the Missouri State Penitentiary and observed no mice, mice droppings, roaches, or other vermin.

Mr. Henderson, one of defendants' experts, visited the dining area at the Penitentiary during both his 1976 and 1978 tours. He testified that the cleanliness and sanitation was "very good" on both occasions, noting that tables and floors were being cleaned continuously during the meal. He further observed that the dining room operation was "very relaxed," with inmates moving in and out in a relaxed, non-regimented fashion. He described both the atmosphere and noise level as "healthy," and commented that the inmates seemed to be enjoying their meals. He further testified that there were no long serving lines, that inmates could sit wherever they desired, and that no one had to wait for a seat. Additionally, Mr. Henderson ate the meal that was being served at the time of one of his tours and commented that it was very good.

Mr. Henderson described the cleanliness and sanitation of the food preparation area as "excellent." He concluded that the food service operation at the Missouri State Penitentiary compared favorably to that of other correctional institutions he has seen.

E.

*The Canteen Area*

The parties have stipulated that "[p]risoners do not have access to the canteen every day, but are permitted to visit the canteen once a week with a list of requested items. Once at the spending window, the inmate is not allowed to add, delete, or otherwise deviate from his itemized list."

Inmate Gardner explained that each inmate is required to make a list of items he wants to purchase before going to the canteen, that inmates are not allowed to change their lists upon arrival, but that they can stay at the canteen as long as necessary in order to make their purchases.

Inmate Sandifer further explained that the inmates go to the canteen in groups determined by their initials. For instance, his group, which goes to the canteen Friday evenings between 7:30 and 9:00, consists of those inmates who work in prison industries and who have last names beginning with the letters M through Z. He testified that his group, at times, has grown as large as 150 and that the biggest problem with regard to the canteen area is overcrowding. He stated that the canteen area is particularly overcrowded during the week immediately following the time when inmates employed in the prison industries get paid.

He described the canteen as a tense area, where inmates get tired of standing in line and where arguments develop. He has not, however, witnessed any actual fighting in the canteen area.

Inmate Owens, on the other hand, does not view the canteen area as a problem. His group, which goes to the canteen on Fridays from 5:30 to 7:30 p. m., consists of approximately one hundred inmates. He states that it takes him between forty-five minutes and two hours to make his purchases and that he has never had any problems in doing so within the time allotted.

## F.

### Inmate Employment

Inmates are allowed to earn money by engaging in various jobs which are made available to them at the Penitentiary. Inmate Norwood has worked as a dental assistant for the last one and one-half years, Sours works at the bakery between 5:00 a. m. and 7:00 to 7:30 a. m., six days a week, Neighbors serves as the Penitentiary's exterminator, Hawkins is on call twenty-four hours a day as a hospital worker, Gardner works at the metal plant four days a week, Berry is employed at the cleaning factory, McClain is the audio-visual clerk at the Penitentiary's library and works seven days a week from 5:00 to 9:30, Peck, along with an assistant, works as an oven cleaner at the main kitchen, and Owens works at the tailor shop making, among other things, inmate shirts and pajamas.

Several of the inmates who testified complained that there was not enough work to do and that often two or more inmates were assigned to do a job that one could do.

Expert witness Nagel, on his tour of the industrial area just before he testified, said he was upset by what he saw. He observed that many inmates employed in prison industries were idle, drinking coffee, chatting among themselves, reading magazines, or playing dominoes. In the Metal Plant, for instance, he estimated that two-thirds of the 182 inmate-employees were idle; in the Industrial Machine Shop, only one of the eighteen inmate-employees was working; in Furniture Factory No. 1, approximately fifty to sixty inmates were working, while approximately ten were idle; in Furniture Factory No. 2, all thirty-six inmate-employees were working; in the Clothing Factory, 30% were idle; in the Shoe Factory, only eight of thirty-one employees were working; in the Glove Factory, about one-third were idle; in the Soap and Laundry Factories, there was a great deal of idleness. In Mr. Nagel's opinion, on-the-job idleness in prison industries is an inexorable consequence of overcrowding.

Mr. Henderson was not as critical of the prison industries at the Penitentiary. First, he observed that the work areas were clean. He then noted that the activity level varied, some factories being very active, and others (specifically the shoe factory and metal factory) being unusually idle.

## G.

### Other Inmate Activities

A variety of activities, other than prison industries employment, is made available to the inmates by the Penitentiary.

Associate Warden Armontrout testified that the recreational facilities available at the Penitentiary include an oversized gymnasium containing six basketball goals (capable of simultaneously accommodating two full court games or six half court games), three baseball diamonds, seven handball courts, a weight lifting machine that can be used simultaneously by sixteen inmates, shuffleboard decks, ping pong tables, card tables, an outdoor roller skating rink, two paddle tennis courts, two volleyball courts, and four outdoor basketball goals.

In addition to this, those inmates in Housing Unit No. 7 have available for their exclusive use a baseball diamond, two handball courts, a basketball goal, certain body building equipment, two horse shoe pitches, a pool table, a ping pong table, approximately thirty game tables, a boxing area, one 35 millimeter movie projector, and one 16 millimeter movie projector.

In addition to having available to them those recreational facilities available to the other inmates in general population, those inmates in Housing Unit No. 4 have the use of two pool tables, one ping pong table, one snooker table, two color televisions, and nu-

merous game tables; those inmates in Housing Unit No. 6 have available to them two pool tables, one ping pong table, one color television, and many game tables; those inmates in Housing Unit No. 9 have available to them one ping pong table, one pool table, one color television, and many game tables. Those inmates who work and live in the hospital, have available to them two pool tables, one ping pong table, two color televisions, six black and white televisions, one game set which accommodates forty players at once, and many game tables.

The indoor recreational facilities may be utilized by the inmates in Housing Unit No. 4 from 6:00 a. m. to midnight, by the inmates in Housing Unit No. 6 from 6:00 a. m. to 10:00 p. m., by those in Housing Unit No. 7 from 6:00 a. m. to 10:00 p. m., and by those in Housing Unit No. 9 twenty-four hours a day.

Mr. Armontrout further testified that the gymnasium available to the general population has a large stage and is used for inmate variety shows, outside entertainment (he said that three bands were coming to perform at the Penitentiary during the month following trial), and movies. The gym is also used for banquets by various inmate organizations where inmates can invite guests from the outside to attend.

He testified that the recreational areas are open to inmates in general population from 7:30 a. m. to 3:00 or 3:30 p. m. every day (assuming the inmate is not on a work assignment) and from 5:15 or 5:30 p. m. to 8:30 or 9:00 p. m. On Saturdays, Sundays, and holidays, up to 1500 inmates use the various indoor and outdoor recreational facilities simultaneously, according to Mr. Armontrout. During the week, in the daytime, approximately 300 to 400 inmates use the recreational facilities while approximately 1000 use the facilities after count clears on the weekdays.

The Penitentiary also has a Vocational Training School which trains inmates in a variety of skills, including office machine repair, small engine repair, television, air conditioner, radio, and refrigerator repair,

nurses aid training, and dental technician training. According to Mr. Armontrout, all instructors at the Penitentiary's Vocational Training School are certified by the Missouri Division of Education, all inmates are eligible to attend, and there is not a waiting list. An inmate enrolled in the Vocational Training School would spend from 8:00 a. m. to 11:00 a. m. and from 12:30 p. m. to 3:30 p. m. at the school.

The academic school provides instruction to over 400 inmates. In addition to covering grades 1–12, it offers a G.E.D. program and a four-year college program. The school is open from 7:30 a. m. to 3:00 p. m. and from 6:00 p. m. to 9:30 p. m. It has twelve classrooms and eight civilian teachers, four full time and four part time. All but one of these eight instructors have master's degrees and the one who does not is now working on a master's degree.

Professors at Lincoln University in Jefferson City, Missouri instruct inmates at the college level.

Mr. Armontrout also testified that, in addition to the various religious groups, there were many active social clubs and service organizations at the Penitentiary, including Art Club, Bridge Club, Big Brothers, Chess Club, Lifers, Inc., Jaycees, Toastmasters, NAACP, Alcoholics Anonymous, Transactional Analysis, Yoga, and D.E.P.A.R.T. (a drug rehabilitation organization). He pointed out that in February, 1974, when Warden Wyrick assumed his duties as Warden, there were only two such organizations for the inmates at the Penitentiary: Alcoholics Anonymous and the Jaycees.

Most organizations meet in the evenings, between 5:30 and 10:00. Alcoholics Anonymous, Big Brothers, and D.E.P.A.R.T. meet daily, the Jaycees and Toastmasters meet weekly, and all others meet several times every week. These meetings are usually held in one of the Special Activities Rooms, TV rooms, Adjustment Board rooms, etc. Each organization is allowed to have one banquet per year where inmates can invite family and friends from the outside to attend.

Most of the inmates who testified took advantage of these various recreational, educational, social, and service activities. Inmate Helms has attended Vocational Training School since February, 1977, studying Electronics Repair. He is also involved in the Academic School, Lifers Inc., and the College Student Council. Because he has Vocational Training School in the day, two college classes at night, and two other evening out-counts, he testified that he is unable to make use of the Penitentiary Library, which closes at 3:30 p. m. and reopens for the evening at 6:00 p. m.

Inmate Norwood participates in handball and karate at the Penitentiary. Although there are seven handball courts at the Penitentiary, he testified that because each game takes five to ten minutes and because of the number of inmates who like to play, he often has to stand in line for as long as forty-five minutes. Then, if he loses, he has to go to the back of the line and begin his wait all over again. He further testified that what used to be the karate practice area has been ruled out of bounds by the prison authorities, so he now has to practice karate at the outdoor skating rink.

Inmate Sours testified that he played handball about once a week and that he too found it necessary to wait in line approximately forty-five minutes to play a ten minute game.

Inmate Gardner testified that he has been involved in educational programs since he arrived at the Penitentiary in September, 1976, but that he has never been able to take all the courses he desired. He told the Court that last semester he was able to take only one of the courses he wanted and was unable to enroll in College Algebra 113 and Colonial History because those courses met at times which conflicted with his work schedule at the metal plant.

Mr. Gardner further testified that he was active in the inmate wrestling team before it was dissolved,[11] and presently runs on the track early in the morning and occasionally lifts weights to keep in shape.

Inmate Sandifer testified that he lifts weights to keep in shape and that he is on out-counts (i. e., engaged in inmate organizational activities) "all the time." He states that he is in his cell from 4:00 p. m. to 7:00 a. m. "very few times." His activities include meeting with the Transactional Analysis group on Thursday evenings and brailling for the blind on Friday afternoons.

Inmate Mack is undoubtedly one of the busier inmates at the Penitentiary. He serves, as previously mentioned, as President of Lifers, Inc., President of the NAACP, and Clerk of Alcoholics Anonymous. In addition, he is Secretary of the Presidents Council, an inmate council which has as its members the presidents of all inmate organizations.

Mr. Mack testified that there are presently fourteen inmate organizations at the Penitentiary, including Lifers, Inc., Jaycees, Toastmasters, Great Books, Transactional Analysis, Transcendental Meditation, Chess Club, Bridge Club, D.E.P.A.R.T. (a drug rehabilitation organization), Big Brothers, World Community of Al-Islam in the West, and Moorish Science.

Although he was uncertain of the membership of some of the organizations, Mr. Mack testified that there were 47 inmates in Lifers, Inc., 165 in the NAACP, 40 or fewer in the Jaycees, 35 in Toastmasters,[12] 28 in Great Books, 35 in the Chess Club, 45 in the Bridge Club, and just over 100 on D.E.P.A.R.T.

There are two Special Activities Rooms at the Penitentiary, located off the main corridor of the Control Center. Special Activities Room No. 1 has an eighty-person capacity, according to Inmate Mack, while Special Activities Room No. 2 has a forty-person capacity. Office space is provided in

---

11. According to Mr. Gardner's testimony, the inmates who were involved in boxing at the Penitentiary practically monopolized the use of the only boxing/wrestling ring at the institution, allowing the wrestling team to use the ring only on Friday evenings and Saturdays. As there were no other facilities available to the wrestling team, it was dissolved.

12. Inmate Mack noted, however, that the Toastmaster chapter at the Penitentiary is presently inactive.

Special Activities Room No. 2 for Lifers, Inc., the Jaycees, the World Community of Al Islam in the West, and Moorish Science, while the Transactional Analysis group is provided a filing cabinet in Special Activities Room No. 1.

In addition to these two Special Activities Rooms, Mr. Mack testified that the Interview Room (located near the Special Activities Rooms), the Catholic Chapel, the library, and the outer area of the Adjustment Board Room are used as meeting places for some of the groups.

There is both a Protestant and Catholic Chapel at the Penitentiary. The World Community of Al Islam in the West and Moorish Science make use of Special Activities Room No. 2, while a group of Jewish inmates use the Interview Room for meetings every Thursday.

Inmate Mack testified that, in his opinion, the Missouri State Penitentiary was overcrowded. He noted that there was a waiting list to join Great Books and that because there is a 200 person limit on the size of banquets, the NAACP had to hold two separate banquets to accommodate all its members and their guests (each member of an organization is allowed to bring two guests to that organization's banquet). He further noted that an effort to begin a Black Awareness Program at the Penitentiary was disallowed by the Inmate Programs Director because of the lack of available meeting facilities.

Expert witness Nagel testified that he observed eight handball courts at the Penitentiary and that thirty-two inmates could play handball at once on these courts. He did, however, observe what he described as long waiting lines at the courts. He described the gymnasium as good, pointing out that it had six basketball goals. Nevertheless, he felt that this was not sufficient to accommodate the number of inmates housed at the Penitentiary.

The recreational facilities at the Penitentiary, according to expert witness MacDougall, were clean, just like the rest of the institution. In addition, Dr. MacDougall testified that the quality of the recreational facilities available to the inmates at the Missouri State Penitentiary, far exceeds anything that he has seen at any other correctional institution, including the Federal Penitentiaries.

Expert witness Henderson testified that "it's very obvious that the administration has gone to great lengths to provide an outstanding recreation program. It's diversified, it covers a lot of inmates. Inmates were very active as I toured the recreational space both times. It compares—the recreational space compares favorable to any institution I've visited."

### H.

#### Double Celling

The most direct effect of the recent growth in inmate population at the Missouri State Penitentiary is the increasing use of double, and even triple, celling. According to the Stipulations of the parties, as of September 16, 1978, the various housing units at the Penitentiary contained the following distribution of cells containing one, two, and three men:

| Housing Unit | One Man Cells | Two Man Cells | Three Man Cells |
| --- | --- | --- | --- |
| 1 | 0 | 59 | 3 |
| 2 | 90 | 276 | 0 |
| 3 | 0 | 222 | 0 |
| 4 | 0 | 136 | 0 |
| 5 [13] | 88 | 138 | 0 |
| 6 | 86 | 0 | 0 |
| 9 | 55 | 0 | 0 |
| Adjustment Unit | 0 | 18 | 0 |
| STU | 0 | 138 | 0 |
| Administrative Segregation Unit [14] | | | |

---

13. Exclusive of the Special Treatment Unit.

14. Neither the evidence nor the stipulations reveal the exact distribution of one-, two-, and three-man cells in the Administrative Segregation Unit on a given day. However, the evidence does indicate that the Unit contains five cells with one bed and fifty cells with two bunks, and that on July 1, 1978, it housed 152 men.

It should be noted that the above chart does not include Housing Unit No. 7, which is a dormitory and does not have cells or cubicles nor the Hospital.

The effects of double celling were discussed both by the inmates and the experts. Inmate Norwood (HU 5) testified that when two men are put together in a cell the size of those in Housing Unit No. 5 (47.18 square feet), it is impossible for the two to pass one another from the bars to the toilet without touching. In addition, he complained that one effect of double-celling is that he never has any time to think.

Inmates Helms (2A) and Gardner (5A) also testified that space was so scarce in their two-man cells that it was impossible for cellmates to pass one another from the bars to the toilet without touching. Consequently, when one was on the floor of the cell, the other had to be on his bunk. Helms and Gardner further testified that, although they are permitted to have two lockers in a two-man cell (one per inmate), they choose instead to share their lockers with their cellmates because of the lack of space.

Inmate Gardner further noted that he and his cellmate are confined to such a small cell that tension develops. While he has never had a fight nor even a heated disagreement with his cellmate, he has seen his college grades drop since he was given a cellmate.

Inmate Peck (HU 3B) testified that it is 100% better to cell alone, pointing out the importance of privacy and the ability to have room to just get up and walk around within the cell. He said that a cellmate causes him to be "uptight constantly."

Plaintiffs' expert, Dr. Ernest L. V. Shelley, testified that there are many untoward effects of double celling, including:

(1) loss of privacy;

(2) increased management problems, since two inmates can plot mischief than one;

(3) increased surveillance problems;

(4) increased peer pressure to join what Dr. Shelley calls "the culture of the yard";

(5) increased homosexuality;

(6) an increase in escape attempts and in plots to escape;

(7) adverse effects on rehabilitation;

(8) loss of "psychological space," resulting in increased tension, aggression, and hostility;

(9) increased noise and increased distractions (this, according to Dr. Shelley, makes it difficult for inmates to engage in thoughtful reflection, to re-examine their attitudes, and to be penitent, all of which, according to Dr. Shelley, are key elements to true rehabilitation).

Mr. Nagel, plaintiffs' other expert witness, stated that, in his opinion, when double celling starts to occur in a maximum security prison, it is overcrowded. He testified that a cellmate deprives an inmate of the last residual of privacy, that two-man cells contribute to homosexuality, and that because it is not always possible for inmates to choose their cellmates, friction, hostility, and fighting often result. It was his opinion that there should never be double-celling at a maximum security institution.

He further testified that when he toured the Penitentiary's Adjustment Unit (Punitive Segregation), Administrative Segregation Unit, and the Special Treatment Unit (Protective Custody) just before testifying, he noticed there were from two to four inmates per cell. This, he said, violates his sense of humanity and security.

Mr. Henderson, one of defendants' experts, testified that he had a personal and professional preference for one-man cells at maximum security institutions, pointing out that one-man cells provide the inmate a greater degree of privacy and facilitate improvements in security, control, and supervision. He did, however, testify that in spite of his preference for one-man cells, he

did not consider double-celling "inadequate," provided, of course, that the square footage was sufficient to accommodate two persons. In fact, Mr. Henderson testified that two-man cells are simply a fact of life in this nation's prison system and that there are many two-man cells within the federal prison system. He further noted that some inmates at the Missouri State Penitentiary told him that they actually preferred having a cellmate as opposed to celling alone, and pointed out that his experience with various correctional institutions has shown him that this preference is not unusual.

Dr. MacDougall, defendants' other expert witness, was also of the opinion that double-celling is not desirable, pointing out that the privacy afforded by a single cell helps give the inmates a sense of dignity. This preference for one-man cells does not, however, cause him to condemn double-celling as inadequate per se. For instance, he viewed the 109 square foot cells of Housing Unit No. 4 to be capable of adequately housing two inmates, and considered the 65 square foot cells of Housing Unit No. 3 to be "not quite" adequate to house two men.

## I.

### The Adjustment Unit (Punitive Segregation)

As pointed out earlier, the Adjustment Unit is located in Housing Unit No. 3, and is the facility where inmates are confined, for ten days or less, for infractions of Penitentiary rules. Of the eighteen cells in the Adjustment Unit, nine measure 66 square feet while the remaining nine measure 69 square feet.

Those confined to the Adjustment Unit are required to remain in their cells except during showers, visitation, consultation with attorneys, and hospital treatment. No exercise time is provided outside the cells, meals are brought to the cells, and there are no sheets, pillows, lights, chairs, or tables inside the cells. The cells are equipped to handle two men each.

Inmate Norwood testified that he has been in the Adjustment Unit for ten days on several different occasions. On one occasion, in August or September of 1977, there were four other inmates sharing his cell for three or four days, during which time two slept on bunks while the remaining three slept on mattresses on the floor. He could not, however, remember the names of any of those with whom he shared the cell during this period.

Inmate Clemmons testified that he spent nine days in the Adjustment Unit in February, 1977 and that for six of those nine days there were two other men in the cell. He stated that two of them slept on the bunks while the third slept on the mattress on the floor. He does not, however, recall the names of those with whom he shared the cell.

Inmate Sours claimed that he had spent ten days in the Adjustment Unit in 1975, that his cell had no bunks, and that he had to sleep on a mattress on the floor.

Inmate Gardner stated that he was in the Adjustment Unit for ten days, during which time he was housed in a cell containing two bunks. He further stated that for ten days and nine nights, he shared the cell with three others and that during one of those nights, they had only one mattress provided them for the two inmates who were to sleep on the floor.

In August, 1978, inmate Berry spent ten days in the Adjustment Unit. During one night, he testified that he shared the cell with three others, and during another night, he shared the cell with two others. The remainder of the time, he had but one cellmate. Mattresses were provided those who had to sleep on the floor.

Inmate Sandifer testified that he was confined to the Adjustment Unit for a period of ten days about a year ago. He shared the cell with two others and, for just a few hours, with a third inmate. Again, a mattress was provided the additional inmate.

Inmate Owens testified that he spent five nights in the Adjustment Unit in June of 1978 and that he shared the cell with four others the first night, five others the second, three others the third, and four others the fourth and fifth nights. He could not, however, recall the names of any of those other inmates.

Mr. Nagel, one of two expert witnesses called by plaintiffs, testified that when he toured the Penitentiary just before testifying, there were two to four men per cell in the Adjustment Unit, and that this violated his sense of humanity and security.

Mr. Henderson, one of defendants' experts, described the Adjustment Unit at the Missouri State Penitentiary as "an adequate operation," and observed that the cells, toilets, and showers of the Adjustment Unit were clean and sanitary.

J.

*The Administrative Segregation Unit*

As previously noted, the Administrative Segregation Unit, which is located in the same structure as Housing Unit No. 3, is used to house inmates who have committed acts of violence or attempted to escape. There are five one-man cells and fifty two-man cells, each measuring 65 square feet. Each cell is furnished with beds, mattresses, a toilet, and a basin, but has no table, chair or locker. Inmates are permitted to have radios, games, food, cigarettes, books, newspapers, and other personal items in their cells.

Inmate Norwood stated that he had spent 15 months in the Administrative Segregation Unit in a two-bunk cell and that for one or two of those months, there were three other inmates in the cell with him. He said that they were permitted to exercise outside only once every two weeks, and then for only ten minutes. He further stated that the exercise yard for inmates in the Unit is a fenced area between Housing Units 2 and 3 which, according to his estimate, measures fifty yards by twenty yards.

Inmate Clemmons was confined to the Administrative Segregation Unit for a period of seventeen months for assaulting a guard. He was housed in a three-bunk cell, according to his testimony, but had only one cellmate.

Inmate Sours testified that he spent eight months in Administrative Segregation in 1975 and that he shared a two-bunk cell with two other inmates during that period of time. At one point, according to his testimony, he shared the cell with as many as five other inmates. Again, mattresses were provided those who had to sleep on the floor. Mr. Sours further stated that he was allowed to shower once every three days while confined to the Unit.

Inmate Sandifer testified that in April, 1977, he spent six days in the Administrative Segregation Unit in a three-bunk cell, which he shared with three other inmates. A mattress was provided for those who had to sleep on the floor.

Inmate McClain claims to have spent ten months in Administrative Segregation during 1976-77 in a two-bunk cell. During a couple of those months, according to his testimony, he shared the cell with four others, and three mattresses were provided those who had to sleep on the floor. He further testified that he was permitted to exercise outside just once every three to four weeks and then for just one hour.

Mr. Henderson, one of defendants' experts, testified that some cells in the Administrative Segregation Unit at the Missouri State Penitentiary contained one man, some contained two men, and still others contained as many as three. He expressed disapproval of placing three inmates in the Administrative Segregation cells.

He observed that the common areas within the Unit were very clean, but noted that some of the individual cells within the Unit were not up to standard in terms of cleanliness. When asked how the Unit at the Missouri State Penitentiary compared with

like units in other penitentiaries, Mr. Henderson testified that except for the three-man cells, the Administrative Segregation Unit at the Missouri State Penitentiary "was acceptable."

He further explained that it was his personal philosophy that all cells in an Administrative Segregation Unit should be single cells, but was quick to point out that "that very rarely is accomplished anywhere." In fact, he testified that some of the federal prisons which he supervises as Regional Director of the North Central Region of the Bureau of Prisons have Administrative Segregation Units with two-man cells.

## K.

### The Special Treatment Unit (Protective Custody)

As previously noted, the Special Treatment Unit, contained in Housing Unit No. 5A, houses inmates who have expressed a fear of living in General Population.

At trial, inmate Hawkins related his experiences with STU. When he arrived at the Diagnostic Center (Housing Unit No. 1) in January, 1978, Mr. Hawkins stated that he had enemies in the General Population. Consequently, he was placed in STU. He remained there for several months, but decided to check out of the Unit because, according to his testimony, he was locked up all the time and just got out one hour a week for gym.[15] He was then, at his request, released into General Population and placed in Housing Unit No. 3B. On his second day there, he was assaulted by three other inmates. He then went to the hospital for a week, then spent a week in the Diagnostic Center, was then placed in the Special Treatment Unit for a few more

days, and was finally placed in a room at the Hospital, where he presently lives and works.

According to the Stipulations of the parties, as of September 16, 1978, the Special Treatment Unit contained 138 cells, with two men in each cell. The cells in STU have the same furnishings as those in the permanent housing units, and are separated from the other cells in Housing Unit No. 5A by a chain link fence.

## IV

### DISCUSSION OF THE CASE

### A.

#### An Overview of the Applicable Law

■ In determining whether the conditions which exist at the Missouri State Penitentiary transgress the Cruel and Unusual Punishment Clause of the Eighth Amendment,[16] this Court is acutely aware of the Supreme Court's caveat that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and that "the problems of prisons in America . . . are not readily susceptible of resolution by decree." *Procunier v. Martinez*, 416 U.S. 396, 404, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235 (1974). It is particularly important that the federal judiciary give reasonable deference to the appropriate penal authorities when state prisons are involved, *Procunier v. Martinez,* supra, at 405, 94 S.Ct. 1800, for it cannot be overemphasized that "federal courts do not sit to supervise state prisons . . ." *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, 461 (1976). This does not, however, mean that federal judges are to turn their backs on Constitu-

---

15. This testimony is somewhat inconsistent with the Stipulations of the parties. Stipulation No. 73 states, in part, that "[n]o out of doors exercise or recreation is provided for inmates in the Special Treatment Unit. The inmates in this unit are permitted 90 minutes on the flag in Housing Unit 5A once each week and 90 minutes in the gym."

16. The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

tional violations. As noted in *Procunier v. Martinez,* supra, 416 U.S. at 405–06, 94 S.Ct. at 1807:

"[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."

As the Eighth Circuit put the matter in *Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 200 (1974), *on remand,* 410 F.Supp. 251 (E.D.Ark.1976), *aff'd,* 548 F.2d 740 (8th Cir. 1977), *aff'd sub nom. Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978):

"It has been said many times that the courts possess no expertise in the conduct and management of correctional institutions. This court has long recognized that it is only in the exceptional case where the internal administration of prisons justifies judicial supervision. On the other hand, courts need not be apologetic in requiring state officials to meet constitutional standards in the operation of prisons."

■ In examining the conditions of the Missouri State Penitentiary, it must be remembered that this Court's inquiry is limited to determining whether the conditions at the Penitentiary cause inmates to suffer deprivations *of constitutional dimensions.* "[C]ourts must be careful to refrain from imposing upon jail administrators their personal views as to how penal institutions should be operated and the conditions under which inmates should live." *Stewart v. Gates,* 450 F.Supp. 583, 585 (C.D.Cal.1978).

As one writer observed, "courts encounter numerous cases in which the acts or conditions under attack are clearly undesir-able and are condemned by penologists, but the courts are powerless to act because the practices are not so abusive as to violate a constitutional right." Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 72 Va.L.Rev. 841, 843 (1971). As the Fifth Circuit put the matter: "[F]ederal courts should keep their eyes on the main objective, the Eighth Amendment command for the eradication of cruel and unusual punishment. The remedy must be designed to accomplish that goal, not to exercise judicial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions." *Newman v. State of Alabama,* 559 F.2d 283, 287 (1977), *cert. den.,* —— U.S. ——, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).[17]

As to the scope of the Eighth Amendment, the Supreme Court recently stated in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522, 531 (1978):

"The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, 'proscribes more than physically barbarous punishments.' *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251. It prohibits penalties that are grossly disproportionate to the offense, *Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793, as well as those that transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (CA 8 1968)."

In *Trop v. Dulles,* 356 U.S. 86, 100–101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958), the Court noted that "the words of the Amendment are not precise, and . . . their scope is not static. The Amendment must

---

**17.** It should be noted that *Pugh v. Locke,* which was consolidated with *Newman v. State of Alabama* before the Fifth Circuit, was reversed in the Supreme Court *sub nom. Alabama v. Pugh* on grounds that are of no present concern to the cause now pending before this Court. *See* —— U.S. ——, 98 S.Ct. 3144, 57 L.Ed.2d 1160.

draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

■ The Amendment's prohibition against cruel and unusual punishment "is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement." *Gates v. Collier,* 501 F.2d 1291, 1301 (5th Cir. 1974). Confinement itself will result in a finding of cruel and unusual punishment, however, only "where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of a reasonably civilized people." *Chapman v. Rhodes,* 434 F.Supp. 1007, 1018 (S.D.Ohio 1977).

The *Chapman* Court, at 1019, succinctly stated the question to be resolved in cases such as the one now before the Court, thus:

"The question is constantly stated as one of ascertaining the 'totality of the circumstances' of the particular case and then inquiring into whether the totality as determined is intolerant or shocking to the conscience, or barbaric or totally unreasonable in the light of the ever changing modern conscience."

Having carefully reviewed the many cases on the subject of prison overcrowding, this Court is in whole-hearted agreement with Chief Judge Hogan's conclusion that "[s]ince the 'totality' of the circumstances differ from case to case, it is difficult to find 'controlling' authority." *Id.,* at 1019.

Many of the cases are easily distinguishable from the one now before the Court. For instance, the Second Circuit in *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392 (1975) declared double-celling of pretrial detainees in 5' by 8' cells violative of the equal protection and due process clauses of the Fourteenth Amendment. There, however, in-

mates were served their meals in their cells, and spent from fourteen to sixteen hours each day inside their cells with their cellmates. Further, the Court specifically found that the district court's order enjoining the use of double celling in that it applied to sentenced inmates as well as to pretrial detainees.

This distinction between the rights of the pretrial detainee vis-a-vis the sentenced inmate is an important one. In *Wolfish v. Levi,* 573 F.2d 118 (2d Cir. 1978), the Court observed that while "pretrial detainees may be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration,' . . . [t]he parameters of judicial intervention into the conditions of incarceration for sentenced prisoners are more restrictive than in the case of pretrial detainees. An institution's obligation under the Eighth Amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Id.,* at 124, 125. Consequently, while the Second Circuit affirmed the District Court's injunction against the double-celling of pretrial detainees in 75 square foot rooms, it remanded as to the district court's ban on the double-celling of sentenced inmates, stating that the district court had "ignore[d] our insistance that different and higher constitutional standards must be applied to pretrial detainees than to sentenced prisoners. As we noted earlier, appellants owe the convicted population merely the duty of providing adequate housing."

Thus, the D. C. Circuit's affirmance, in *Campbell v. McGruder,* 580 F.2d 521 (1978), of the district court's order enjoining the use of double-celling pretrial detainees in 48 square foot cells is of little precedential value in the case now before the Court.[18]

---

18. The *Campbell* Court noted that "[p]retrial detainees generally retain more rights than convicted prisoners. . . . Hence, the federal courts' 'duty to protect constitutional rights' conceivably may justify more intrusive relief with pretrial detainees than with sentenced inmates." *Id.,* at 527, n. 9.

In fact, the Fourth Circuit, in *Hite v. Leeke*, 564 F.2d 670, 674 (1977), declared that the cases cited to it by plaintiffs (who were convicted prisoners) dealing with overcrowded conditions of facilities housing pretrial detainees "lend no support to the claims of the plaintiffs."

With regard to those cases dealing with overcrowding in institutions which house sentenced inmates, the Tenth Circuit, in *Battle v. Anderson*, 564 F.2d 388, 395 (1977), declared that

> "where prisoners are forced to sleep in garages, barber shops, libraries, and stairwells; and where they are placed in dormitories without any toilet and shower facilities the crowding has passed the constitutional threshold. The Court is equally or more offended by the housing of two men within a little 35—40 square foot 'cubbyhole'. Such crowding offends the contemporary standards of human decency . . ."

In *Crowe v. Leeke*, 540 F.2d 740, 742 (4th Cir. 1976), the Court ruled that housing three sentenced inmates in a cell measuring six feet high, nine feet long, and seven feet wide "is not a condition of confinement which shocks the conscience so as to fall within the constitutional prohibition against cruel and unusual punishment," even though each "cell is so small only two inmates can sleep in beds, forcing the third inmate to sleep on the floor." *Id.*, at 741.[19]

In *Hite v. Leeke*, 564 F.2d 670 (4th Cir. 1977), suit was brought by three state prisoners, incarcerated in the South Carolina Kirkland Correctional Institute, who claimed "that the conditions at the Institute constituted cruel and unusual punishment because the inmates were assigned to double occupancy of cells, 65 feet square, which were initially designed for single occupancy . . . ." *Id.*, at 671. The Fourth Circuit denied their claims, pointing out that it knew of no case "that holds dual assignment of prison inmates alone to constitute 'cruel and unusual punishment,' " and concluded that "[t]he decision in *Crowe* would appear conclusive on the issue of dual assignment of inmates in this case." *Id.*, at 674, 675.

Emphasizing that "[t]he sole issue in *Hite* was whether double-celling alone constituted a constitutional deprivation," and that the *Hite* "court was careful to point out that the 'totality of conditions' in other situations might reach constitutional dimensions and require relief," Judge Blair, in *Nelson v. Collins*, 455 F.Supp. 727 (D.Md., filed May 17, 1978), declared unconstitutional the double-celling of inmates at the Maryland State Penitentiary and the Maryland Reception, Diagnostic and Classification Center (MRDCC) in cells containing 44 square feet and 50.7 square feet. Like the Missouri State Penitentiary, the buildings which constitute the Maryland Penitentiary and the MRDCC were constructed partly in the 1800's and partly in the early 1900's. The Maryland inmates spend from ten to sixteen hours per day in their cells, but this Court is unable to determine from the *Nelson* opinion whether the Maryland inmates enjoyed as wide a range of social, educational, and recreational activities as do the inmates at the Missouri State Penitentiary.

The Southern District of Ohio, in *Chapman v. Rhodes*, 434 F.Supp. 1007 (1977), declared unconstitutional the double-celling of inmates in 60 square foot cells at the Southern Ohio Correctional Facility at Lucasville, Ohio. It should be noted that the Ohio facility is much newer than the buildings at the Missouri State Penitentiary (the Ohio facility was built in the early 1970's), and that it is, in the Court's words, "a top-flight, first-class facility" "from a brick and mortar viewpoint." *Id.*, at 1009. However, unlike the Missouri State Penitentiary, at the Ohio facility, according to the Court, "[a]t the best a prisoner who is dou-

---

**19.** In refusing to enjoin the use of 63 square foot cells to house three men, the Fourth Circuit noted that the plaintiff/inmate had been approved for a transfer to a new correctional institution that was, at the time of the suit, under construction.

ble celled will spend most of his time in the cell with his cellmate. A substantial number must so spend all but six hours a week and another substantial number all but four hours a week." *Id.*, at 1021. The Court was also careful to point out that "[c]onstitutionality and unconstitutionality are relative or elastic terms and we certainly are not concluding that all double celling in any 60 square foot cell is beyond the ambit." *Id.*, at 1021.

In *Johnson v. Levine*, 450 F.Supp. 648 (D.Md.1978), Judge Harvey, employing the "totality of conditions" approach, declared unconstitutional the double-celling of inmates in forty square foot cells at the Maryland House of Corrections, a medium-security penal institution built in the 1800's.

In *West v. Edwards*, 439 F.Supp. 722 (D.S.C.1977), the Court was faced with an inmate suit charging that the triple-celling of inmates in 66 square foot cells at the Kirkland Correctional Institute constitutes cruel and unusual punishment. Rather than viewing the matter as 22 square feet per inmate, the Court included in its square footage per inmate calculation the 2,850 square feet of "bay area" available to every set of 64 cells (containing 192 inmates) and 1,052 square feet of hallway outside every set of 64 cells. Having thereby arrived at 42.3 square feet of "living space" per inmate, the Court declared that triple-celling was not violative of the cruel and unusual punishment clause of the Eighth Amendment.

As is readily apparent, the holdings of the various cases are as varied as the factual settings from which they arise. While they are constructive and helpful, they are far from determinative of the issues now before this Court.

## B.

### *Some General Observations*

Before determining whether the conditions at the Missouri State Penitentiary constitute cruel and unusual punishment, several general observations are in order.

First, this Court must be cautious not to place undue emphasis upon "design capacities" and the minimum square footage mandates of other Courts. As stated in *Newman v. State of Alabama*, 559 F.2d 283, 288 (5th Cir. 1977):

"Unless intended to apply only to existing facilities we do not discern the constitutional basis for the requirement that Alabama state prisoners shall be housed in individual cells, nor can we agree that 'design' standards, *without more*, amount to a *per se* constitutional limitation on the number of prisoners which may be housed in a particular prison facility. Those who design prisons are not vested with either the duty or the power to prescribe constitutional standards as to prison space. Assuming that the District Court intended these limitations to apply only to presently existing prisons and not to those hereafter to be constructed the judgment in these respects is affirmed.

"The Court required that all new prison construction should provide sixty square feet of space per prisoner. We remand this requirement to the District Court for further consideration in the light of our opinion in *Williams v. Edwards*, 547 F.2d, at 1215."

Second, with regard to the minimum square footage standards of various professional associations, this Court fully concurs in the following observation by Judge Blair in *Nelson v. Collins*, 455 F.Supp. 727 (D.Md., filed May 17, 1978):

"ACA [American Correctional Association] standards for the operation of correctional institutions are instructive and useful guidelines but they are not dispositive on the question of constitutional deprivations. They are postulated as desirable correctional goals and in many instances appear to be aspirational."

Third, in applying the "totality of circumstances" approach to the conditions at the Penitentiary, the Court is convinced that the relaxed, amicable atmosphere which has

been generated by the prison administration and which permeates the Penitentiary must, in any area of doubtful constitutionality, tip the scales in favor of the State.

The expert witnesses who toured the Penitentiary emphasized that the emotional climate at the Penitentiary was exceptionally relaxed and friendly. As Mr. Henderson, an expert witness called by defendants, observed:

"On both occasions as I toured the institution [once on August 11, 1976 and once on October 4, 1978, the day before he testified], I sensed a very relaxed atmosphere and climate of the institution. There seemed to be open communication between staff and the inmate population. I did not observe any tension. I think Warden Wyrick—inmates were free to approach him and they showed a great deal of respect for him.

"In all the institutions I've visited, I've not seen a high staff that was more visible in an institution, that the inmate population knew better and obviously went out of their way to contact them.

"Several [inmates] told me that when they were advised by other inmates, if they have any problems, be sure to see Warden Wyrick. He's very visible throughout the institution and I believe highly respected."

Mr. Nagel, an expert witness called by plaintiffs, stated the following with regard to his observations during his 1976 tour of the Penitentiary:

"There were many things I saw about it that indicated to me a care and concern on the part of the people who were running the system. I, for example, didn't see—and these may sound like small things, but I don't think they're small things—I didn't see the drab institutional coloration that you usually see—all gray or all dark green or all dark brown. The institution had been painted in bright colors. I see imagination relative to recreation space."

As for his tour of the Penitentiary the morning before he took the stand, he observed:

"I toured the institution with an assistant warden named Armontrout. . . . I've been an assistant warden long enough to know that the assistant warden is not the most loved man in any institution. It's pretty hard to be loved when you have to do the things that are necessary to maintain control. Yet as I walked through the institution I was rather surprised and pleased with the easy rapport that inmates had with and he had with them.

"I felt an ease between that high administrative office and so many of the inmates, and I think that's fairly good.

* * * * * *

"I concluded that the relationship between him [Armontrout] and the inmates was good, compared to that which you usually see. And one would have to conclude—perhaps carrying it further than you should, that this is not just a characteristic of one man."

Dr. MacDougall testified that he was left with the following impressions from his tour of the Penitentiary:

"Very frankly, it's been along time since I've been as impressed as I was last night, especially with the openness of that institution and with the relationship between a warden and his population. First of all, it was clean, which is unusual for a lot of prisons in this country. I was impressed with the total freedom that inmates have to move about the institution. I was impressed by the morale of the inmates that I saw and talked to. I was impressed about the relationship the inmates had with, particularly, the Warden. The number of activities that go in that institution are far beyond that of most of the prisons I've had experience with. I was tremendously impressed.

* * * * * *

"Everybody I talked to—and again, you measure morale by the relationship they have with staff—both the officers and the inmates went about their business very relaxed—both in the law library or art class or just walking around the yard."

Thus, as is readily apparent, the conditions at the Missouri State Penitentiary are dramatically different than those which have existed within the Arkansas prison system and which have been the subject of much litigation in this Circuit. *See Holt v. Sarver*, 300 F.Supp. 825 (E.D.Ark.1969); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark. 1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971); *Holt v. Hutto*, 363 F.Supp. 194 (E.D.Ark. 1976), *rev'd in part and remanded, sub nom. Finney v. Arkansas Board of Correction*, 505 F.2d 194 (8th Cir. 1974), *on remand, sub nom. Finney v. Hutto*, 410 F.Supp. 251 (E.D. Ark.1976), *aff'd*, 548 F.2d 740 (8th Cir. 1977), *aff'd sub nom. Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). *See also Talley v. Stephens*, 247 F.Supp. 683 (E.D.Ark.1965); *Jackson v. Bishop*, 268 F.Supp. 804 (E.D.Ark.1967), *aff'd*, 404 F.2d 571 (8th Cir. 1968). In those cases, the Courts were faced with "major constitutional deficiencies . . . in housing, lack of medical care, infliction of physical and mental brutality and torture upon individual prisoners, racial discrimination, abuses of solitary confinement, continuing use of trusty guards, abuse of mail regulations, arbitrary work classifications, arbitrary disciplinary procedures, inadequate distribution of food and clothing, and total lack of rehabilitative programs." *Finney v. Arkansas Board of Corrections, supra*, 505 F.2d at 200. As the Supreme Court commented in *Hutto v. Finney, supra*, 437 U.S. at 687, 98 S.Ct. at 2572, 57 L.Ed.2d at 532: "The [trial] court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the 'lack of professionalism and good judgment on the part of maximum security personnel.'" A reading of the opinions dealing with the Arkansas situation reveals the extent of the horrible conditions which existed there, and further detailing of those conditions will not be made by this Court. Suffice it to say that the conditions existing at the Missouri State Penitentiary are, fortunately, very dissimi-

lar from those within the Arkansas penal system.

The fourth general observation that this Court wishes to make before embarking upon specific findings of fact and conclusions of law is that, as Circuit Judge Henley stated, "[t]he question of whether a prison is overcrowded to the point of unconstitutionality involves more than determining how many square feet of living space are allocated to individual inmates. Regard must be had to the quality of the living quarters and to the length of time which inmates must spend in their living quarters each day; further some small housing units although cramped may be more comfortable and livable than more spacious quarters." *Finney v. Hutto, supra*, 410 F.Supp. at 254.

With these general observations firmly in mind, the Court makes the following findings of fact and conclusions of law.

## V

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ After a careful review of the evidence and after having carefully studied the applicable law, the Court finds, inter alia:[20]

1. The Missouri State Penitentiary at Jefferson City, Missouri is generally clean and sanitary.

2. The shower areas at the Penitentiary, while they are not always as clean and sanitary as one would prefer, are quite satisfactory, particularly for institutional shower areas.

3. The individual cells at the Penitentiary are generally clean and sanitary.

4. While there are broken windows at the Penitentiary, these are replaced at least on an annual basis, during the late Summer or early Fall. Such a system for the replacing of broken windows at the Penitentiary is, under all the facts and circumstances, reasonable.

---

20. These numbered findings are not meant to be exhaustive or exclusive; rather, they are intended merely to supplement and/or make more explicit findings which appear throughout other portions of this opinion. *See generally* Rule 52(a), F.R.Civ.P.

5. While the structure of the cell blocks causes the temperature in the winter to be higher on the upper tiers than on the lower tiers, and while this temperature differential makes the interiors of the cell blocks not as comfortable in the winter as they might otherwise be, the winter temperatures within the cells are not so uncomfortable as to be totally unreasonable or to shock the conscience of the Court.

6. The shower areas at the Penitentiary are cleaner and more sanitary than those at the majority of other correctional institutions in the United States.

7. The noise level in the various housing units is low during most of the day and night. Although it rises between 8:00 p. m. and 10:00 p. m., mainly because of convicts returning to their cells for the evening, it does not rise to such a volume or for such a length of time as to be totally unreasonable or as to shock the conscience of the Court.

8. The food preparation and dining areas at the Penitentiary are reasonably clean and sanitary—as clean and vermin-free as any institutional food preparation area and dining area can reasonably be expected to be. The stories of mice droppings, mold, roaches, etc., while occasionally true and while unappetizing, do not fairly reflect the general conditions which exist in these areas, nor do they appreciably detract from the substantial effort clearly made by the prison authorities to minimize or prevent such conditions.

9. The food served at the Penitentiary is varied, nutritional, wholesome, and appetizing.

10. The dining hall is not so overcrowded that it significantly interferes with inmate meals or the smooth functioning of the food service program.

11. Tension generated by the number of inmates which are in the dining hall at a given time during meals is minimal, although it does exist.

12. The Canteen at the Penitentiary fulfills its function well and operates smoothly and efficiently. Any waiting in line at the Canteen is but a minor inconvenience to the inmates, although it does cause some to become annoyed and tense.

13. While there is a problem in some areas of Prison Industries with inmates being excessively idle, the Prison Industries program at the Penitentiary, *on the whole,* functions smoothly and effectively. When combined with the many and varied educational, religious, social, and service programs available to the inmate population at the Penitentiary, this Court is convinced that an inmate need spend only a minimal amount of his day confined to his cell. This Court further finds that the jobs at which inmates work, together with the various educational, religious, social, and service activities available, provide inmates with meaningful and stimulating alternatives to spending time in their cells.

14. The recreational activities available to inmates at the Penitentiary are many and varied. Although it would be desirable to have more handball courts, more basketball goals, more weight-lifting machines, etc., the Court finds that there is not now a real "shortage" of recreational areas and activities at the Penitentiary.

15. Laundry services are provided for all inmates at the Missouri State Penitentiary once each week, and these services are adequate.

16. The dining facility has a capability of seating 792 inmates at one time.

17. Inmates are not provided a place to hang their coats in the dining hall and the seats provided for inmates do not have backs.

18. Individual cells are not equipped with heat outlets, but are heated by large blowers which are situated at various points throughout the housing units.

19. During the warmer months, air is circulated through the housing units via these blowers.

20. The heating and ventilation provided by these blowers, while primitive, is generally effective, and while not particularly desirable by today's standards, is adequate enough to avoid any valid charge of constitutional dimensions.

21. Housing Unit No. 7 is a dormitory located outside the walls of the Missouri State Penitentiary, is a three story, largely self-contained unit, with its own recreational facilities and dining facilities in addition to living quarters. The inmates assigned to Housing Unit No. 7 work outside the Penitentiary and spend little time within the walls of the Penitentiary.

22. A regular program of pest control exists for all areas of the Penitentiary. Generally, the program is effective but could be improved. Because of the age of the institution and the number of persons who live and work at the institution (with the attendant quantities of food served, etc.), however, pest control is, of necessity, a continuing battle that will never be completely won.

23. Under the conditions which exist at the Missouri State Penitentiary, the number of guards and civilian personnel who supervise the inmate population cannot be termed insufficient. This is not to say, however, that a change in conditions would not lead to an opposite finding; nor is it to indicate that this Court does not feel it would be desirable to increase the number of supervisory personnel at the Penitentiary.

24. The recreational facilities at the Penitentiary are maintained in good repair.

25. The complaints with regard to the academic and vocational training schools at the Penitentiary have been few and minor. The Court finds these schools to provide those inmates who care to participate adequate academic and vocational training.

26. The number of shower areas at the Penitentiary and the times in which the inmates are permitted to shower are sufficient to allow all inmates in General Population who so desire to shower once a day.

27. Both the individual cells and the common areas of each housing unit are inspected for cleanliness on a daily basis by Penitentiary personnel.

28. The Missouri State Penitentiary is overcrowded. However, because there is so much acreage within the walls (47.8 acres), because of the many and varied activities available to the inmates, and because of the relative freedom enjoyed by the inmates to utilize the recreational areas and the many activities available to them, the Missouri State Penitentiary, viewed as a whole, is not now so overcrowded as to be intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking in the conscience of the Court. The Court agrees, however, with Circuit Judge Henley in *Finney v. Hutto, supra*, 410 F.Supp. at 254, where he states: "The question of overcrowding actually involves two questions: First, is the institution as a whole overcrowded? Second, are individual housing units within the institution overcrowded? In other words, the question is not only how many inmates are housed in the prison but also how the prison population is distributed throughout the institution."

With regard to the latter inquiry, this Court finds:

29. Under the totality of the circumstances which exist at the Missouri State Penitentiary, including but not limited to, the ability of inmates to move outside their cells during the day and evening hours, and to participate in numerous work, recreation, education, social, and service programs, and including also the high quality of the administration and staff employed at the Penitentiary, the Court finds:

(a) that the double-celling of inmates in Housing Units 2 and 5 in 47.18 square foot cells does, even under the generally favorable "totality of conditions" which exist at the Penitentiary, result in a living condition which this Court views as intolerable, inhumane, totally unreasonable in light of the modern conscience, and shocking to the conscience of the Court, in violation of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

(b) that the double-celling of inmates in Housing Unit No. 3 in 65 square foot cells does not cause a living condition which is intolerable, inhumane, totally unreason-

able in light of the modern conscience, or shocking to the conscience of the Court, and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

(c) that the double-celling of inmates in Housing Unit No. 4 in 109 square foot cells does not cause a living condition which is intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court, and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

(d) that the single-celling of inmates in the cubicles of Housing Unit No. 6 (each of which measure 49 square feet) does not cause a living condition which is intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

(e) that the single-celling of inmates in the cubicles of Housing Unit No. 9 (each of which measures 51.958 square feet) does not cause a living condition which is intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

(f) that the housing of 112 inmates outside the walls in the open honor dormitory known as Housing Unit No. 7 does not cause a living condition which is intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court, and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

■ 30. Under the totality of the circumstances under which those confined to the Diagnostic Unit (Housing Unit No. 1) must live, this Court finds that the double-celling of inmates in cells measuring 59.2 square feet for a period of one to five weeks is not intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court, in spite of the fact that inmates are confined to their cells for a greater portion of the day than are inmates in the General Population. Persuasive to this Court are these facts: inmates are housed at the Diagnostic Center for a short period of time; they leave their cells three times daily for meals, once a week to go to the canteen, once a week to go to a movie, and once a week for two hours of gym. In addition, much of their time is occupied by meetings with caseworkers, taking a battery of tests, and taking a physical examination. While it is certainly not desirable, in view of the amounts of time spent inside the cells, to double-cell inmates at the Diagnostic Unit in cells measuring 59.2 square feet, it does not amount to cruel and unusual punishment to do so for one to five weeks under those conditions. This conclusions is bolstered by the Court's further finding that both the individual cells and the common areas of the Diagnostic Center are in good repair and are clean and sanitary.

■ *Triple-celling* in these 59.2 square foot cells is, in this Court's judgment and *under the totality of the circumstances which exist in the Diagnostic Center,* intolerable, inhumane, totally unreasonable in light of the modern conscience, and shocking to the conscience of the Court. While the brief duration of an inmate's stay at the Center makes the question a close one, the Court feels that under the unique conditions of the Diagnostic Center at the Missouri State Penitentiary, triple-celling, even for periods of one to five weeks, is cruel and unusual punishment.

31. Those confined to the Special Treatment Unit (Protective Custody) have substantially less time out of their cells than do the general population inmates. Consequently, to confine two inmates to the 47.18 square foot cells of the Special Treatment

Unit is plainly intolerable, inhumane, totally unreasonable in light of the modern conscience, and shocking to the conscience of the Court.

Even though the inmates confined to the Special Treatment Unit have fewer freedoms than do general population inmates, the Court, under the totality of the circumstances which exist in that Unit, does *not* find the confinement of one inmate per cell in the Special Treatment Unit to be intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court.

32. As detailed earlier in this Opinion, those confined to the Administrative Segregation Unit have substantially less time outside of their cells than do general population inmates. While the Unit is used to punish those inmates who have committed serious violations and offenses while in general population (such as murder and escapes) and while those confined to the Unit should therefore have fewer comforts provided them and fewer privileges accorded them than inmates in the general population, this Court nonetheless believes that under the totality of circumstances that exist in the Administrative Segregation Unit, triple-celling in 65 square foot cells is intolerable, inhumane, totally unreasonable in light of the modern conscience, and shocking to the conscience of the Court.

While the conditions of the Administrative Segregation Unit must be unappealing (so as to deter general population inmates from committing acts which might lead to their being placed in that Unit), and while the fact that the Unit is utilized as a means of intra-institutional discipline makes the administration's practices with regard thereto particularly deserving of judicial deference, the Court is convinced that *triple-celling* in 65 square foot cells in the extremely non-stimulating atmosphere of the Administrative Segregation Unit and for the length of time which inmates generally must remain there transgresses the

cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

■ Double-celling under such conditions, while obviously undesirable and while presenting a close question under current constitutional standards, is not intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court. While the thought of spending from ninety days to three or four years [21] in a 65 square foot cell with another inmate under the conditions which exist in the Administrative Segregation Unit is far from appealing, the common areas of the Unit are very clean and sanitary and the individual cells are reasonably clean and sanitary. Further, and as previously noted, because the Unit is utilized to punish those inmates who have committed serious offenses while confined to the Penitentiary, this Court believes it is necessary to give the prison administration considerable deference. Consequently, under the totality of the circumstances, this Court concludes that the double-celling of inmates in the Administrative Segregation Unit of the Missouri State Penitentiary is not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

33. The conditions in the Adjustment Unit (Punitive Segregation), detailed earlier in this Opinion, are dismal indeed. While the Court is cognizant that the situation present at the Missouri State Penitentiary is a far cry from that which faced the Courts in the Arkansas situation, the following language employed by Judge Henley in *Finney v. Hutto*, 410 F.Supp. 251, 277 (E.D.Ark.1977), *aff'd*, 548 F.2d 740 (8th Cir. 1977), *aff'd sub nom. Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), gives cause for concern:

> "The court thinks that from the standpoint of orderly and efficient prison administration the Department would be better off if inmates sentenced to puni-

---

**21.** Stays of three or four years are highly unusual. There is no doubt that the Administrative Segregation Unit at the Missouri Penitentiary is generally operated well within constitutional bounds. *See generally Kelly v. Brewer,* 525 F.2d 394, 399–400 (8th Cir. 1975).

tive isolation were kept alone in individual cells. However, the court is not prepared to go so far as to say that it is unconstitutional to confine as many as two men in the punitive isolation and administrative segregation cells at Cummins and Tucker provided that each man has a bunk to sleep on at night and to sit upon during the day. The court will enjoin the confining of more than two men at any one time in one of the individual cells in question and will require that where two men are placed in the same cell, each must have a bunk.

"This does not mean that in cases of serious emergency as for example a riot or other type of disorder involving large numbers of inmates at the same time, the prescribed cell capacity may not be exceeded for limited periods of time. But the court does not accept the proposition that every disciplinary incident in the Department creates an emergency, or that an emergency continuously exists at either Cummins or Tucker."

While the brevity of the stays in the Adjustment Unit (ten-day maximum) makes the question a close one, particularly in view of the general cleanliness of the Unit, this Court, after careful reflection, is convinced that triple-celling in the 66 square foot cells of the Adjustment Unit, *under the totality of the conditions which exist therein* (i. e., long hours, with little stimulation, confined to the cell), tips the balance in favor of plaintiffs.

34. Upon consideration, *in the aggregate,* of all the conditions which presently exist at the Missouri State Penitentiary, including, *but not limited to,* the conditions and qualities of the individual cells, the showers, the toilets, the dining hall, the kitchen, the windows, the temperature within the cell blocks in the winter and in the summer, the noise level within the cell blocks, the canteen, the recreational areas, the laundry service, the ventilation systems, the visiting room, the pest control program, the various educational, religious, social and service activities, and the prison industries, and further taking into account the crowded conditions which prevail at the Penitentiary, the Court finds that, except in those instances above where the Court has specifically found to the contrary, the conditions of confinement at the Missouri State Penitentiary, when viewed in the aggregate are *not* intolerable in light of the modern conscience, or shocking to the conscience of the Court, and thus are not violative of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.

For the purposes of discussing the appropriate remedy, a conference of counsel will be ordered. At such conference, defendants will be required to submit to the Court a plan which will, with reasonable dispatch, correct the Constitutional deficiencies which have been noted hereinabove. No order will issue at this time. Jurisdiction is retained.